## OIN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **DUANE R. BONDS, M.D.,** | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | Civil Case No. RWT 07-2426 |
| | * | |
| **MICHAEL LEAVITT, et al.** | * | |
| | * | |
| Defendants | * | |

## MEMORANDUM OPINION

Congress enacted Title VII of the Civil Rights Act of 1964 to ensure that employees are treated fairly in the workplace without regard to their age, sex, race, and physical characteristics, among others. These vital protections are designed to ensure that employees are evaluated on the basis of their merit as opposed as to their immutable characteristics. The Civil Service Reform Act provides that a number of factors are to be considered in conjunction with a decision to discipline or terminate a federal employee in order to ensure that (1) the action is proportional to the employee's conduct; (2) employees are subject to consistent criteria and decisionmaking processes; and (3) there is transparency for what may be a life-altering decision. Last, but not least, the Whistleblower Protection Act seeks to provide protection to those employees who go above and beyond the call of duty to report abuses and, in doing so, risk their livelihood.

Congress sought to create a broad shield of protection in these three statutes that would immunize employees from any discrimination, retaliation, or arbitrary decisionmaking. The substantial protections offered by these statutes are subject to important standards regarding the inferences and burdens applicable to the assertion of a claim. In its wisdom, Congress recognized

that not every decision or action that affects an employee or with which an employee disagrees is actionable. Thus, courts interpreting and applying theses statutes and the cases that interpret them must draw a distinction between personality clashes and discriminatory or retaliatory animus, between honestly-held beliefs and reasons for actions taken and pretext, and between asserting one's beliefs and true whistleblowing.

Plaintiff Duane R. Bonds, M.D. has filed a Complaint alleging that Defendants violated the provisions of Title VII, the Whistleblower Protection Act, and the Civil Service Reform Act in removing her as the Project Officer from two medical studies and then removing her from federal service. The Court will address each one of her contentions below.

## I. BACKGROUND

**A.      FACTUAL BACKGROUND**

Dr. Bonds is an African-American, female doctor, who has dedicated her career to combating

sickle cell disease[1] and other medical disorders that severely impact fetal and maternal health.  (Pl.'s

Ex. 1 ¶¶ 1, 5).  She has achieved recognition in the research and understanding of sickle cell disease.

(Pl.'s Ex. 2 OSC Report Summary 2).  In 1990, she left private practice and academia to become the

Deputy Chief of the Sickle Cell Disease Branch of the Division of Blood Diseases and Resources

("DBDR"), a division of the National Heart, Lung, and Blood Institute ("NHLBI") of the National

Institutes of Health ("NIH").  (Pl.'s Ex. 148 at 1).  From 1990 until October 24, 2006, Dr. Bonds was

employed as a medical officer in DBDR.  *Id.*  She was the Project Officer ("PO") for two clinical

trials called "SWiTCH" and "BABY HUG."  (Def's Ex. 1 at1). Her first-line supervisor was Dr.

---

[1]Sickle cell disease is an inherited blood disorder that affects red blood cells, and it is the most frequently inherited blood disorder in the United States.  About Sickle Cell Disease – Sickle Cell Disease Association of America, Inc., http://www.sicklecelldisease.org/about_scd/index.phtml (last visited May 1, 2009). The disease affects primarily individuals of African-American descent, but it also affects individuals descended from Greek, Italian, Arabian, and Indian ancestors.  (Pl.'s Ex. 14).  People with sickle cell disease have red blood cells that contain mostly hemoglobin* S, which is an abnormal type of hemoglobin.  About Sickle Cell Disease, http://www.sicklecelldisease.org/about_scd/index.phtml.  When these predominantly hemoglobin * S red blood cells become sickle-shaped (i.e. crescent-shaped), they have difficulty passing through small blood vessels and may block small blood vessels, which results in less blood reaching that part of the body.  *Id.*  Tissue that does not receive a normal blood flow eventually becomes damaged, which is the most common complication of sickle cell disease.  *Id.*  This can result in lung tissue damage (acute chest syndrome), pain episodes (arms, legs, chest and abdomen), stroke and priapism (painful prolonged erection).  *Id.*  The disease also causes damage to most organs including the spleen, kidneys and liver.  *Id.*  Damage to the spleen makes sickle cell disease patients, especially young children, easily overwhelmed by certain bacterial infections.  *Id.*  There are several types of sickle cell disease, and there is currently no universal cure for sickle cell disease.  *Id.*

Blaine Moore[2] and her second-line supervisor was Dr. Charles Peterson. *Id.* at 2-3. From 1997 to 2004, Dr. Bonds received positive performance reviews, within-pay-grade increases, and awards for her merit and service. (Pl.'s Ex. 3 at 1-54; Pl.'s Ex. 15 at 2).

In October of 1999, Dr. Bonds filed an EEO complaint against Dr. Peterson (later resolved through the NIH Ombudsman office) in which she alleged that he sexually harassed her by requesting that she share a hotel room with him during an overnight business trip and that her refusal to do so resulted in his "interfer[ence] with [her] professional duties." (Pl.'s Ex. 1 ¶ 57).

Dr. Peterson later removed Dr. Bonds from her position as NHLBI's Sickle Cell Disease Group Leader, and Dr. Bonds filed a second EEO complaint in March, 2003. *See* EEOC No. 120-2004-00176X; Agency No. NHLBI_2003-0002. The NHLBI resolved the complaint by creating a new position called the Division of Blood Diseases and Resources Sickle Cell Coordinator, and allowing Dr. Bonds to take that position. (Pl.'s Ex. 1¶ 50).

As noted above, Dr. Bonds was the Project Officer during this time for two clinical trials called "SWiTCH" and "BABY HUG." (Pl.'s Ex. 1¶ 11). The SWiTCH clinical trial studied the effect of the drug Hydroxyurea on infants who have suffered a stroke. (Def. Ex.1 at 6). The BABY

---

[2] Dr. Moore became the first-line supervisor of Dr. Bonds after the departure of Dr. Herman Branson, who had also filed an EEO Complaint against Dr. Peterson. Dr. Branson served as the Program Director for the Blood Diseases Program (a part of the DBDR) and the direct supervisor of Dr. Bonds and thus reported to Dr. Peterson. (Pl.'s Ex. 34 ¶¶ 1, 12). In connection with Dr. Branson's EEO complaint, he alleged that Dr. Peterson seemed to have a personal vendetta against Dr. Bonds. (Pl.'s Ex. 34 ¶¶ 2, 6-7). Dr. Branson also submitted the affidavit of Dr. Jean Henslee-Downey, who stated that Dr. Bonds was on Dr. Peterson's "bad list," and that Dr. Peterson "played favorites" against both Dr. Bonds and Dr. Branson. (Pl.'s Ex. 17 ¶¶ 5, 7-13). Dr. Peterson eventually terminated Dr. Branson, whose position was filled by Dr. Moore, who then became the first level supervisor of Dr. Bonds responsible for issuing her annual performance evaluations starting in 2003. (Pl.'s Ex. 3  47; Pl.'s Ex. 35 ¶ 14). Dr. Branson subsequently filed his own EEO complaint, and Dr. Henslee-Downey submitted a statement on his behalf. (Pl.'s Ex. 17¶ 13).

HUG clinical trial studied the use of Hydroxyurea in infants to ascertain if this drug could prevent the onset of end-organ damage, a major source of morbidity and mortality in sickle cell disease patients. (Def. Ex.1 at 6).

### Discovery of the Immortalized Cell Lines

Dr. Bonds alleges that, in September 2005, she discovered that Dr. Russell Ware, who was a principal investigator in the BABY HUG clinical trial, had obtained genetic material from the blood samples of the BABY HUG infant participants and used them to clone immortalized cell lines[3] without the consent or knowledge of the infants' parents or guardians. (Def. Ex. 1 at 1-10). Dr. Bonds alleges that the test subjects were all African Americans, and that Dr. Ware was harvesting the genetic material without the consent of the subjects. (Pl.'s Ex. 14 at 14-15). On September 6, 2005, Dr. Bonds wrote in an e-mail to Dr. Ware that she was "very dismayed" over his creation of the immortalized cell lines because "NHLBI did not authorize this work, it is not in the protocol, and the work is not specifically mentioned in the consent forms" and she instructed that he "destroy these cell lines immediately." (Pl.'s Ex.6). Dr. Bonds then brought her concerns before the Data and Safety Monitoring Board ("DSMB"). (Pl.'s Ex. 4 at A-18). The DSMB, which is charged with

---

[3]An immortalized cell line is a living tissue sample that is created with a subject's blood; it provides an unlimited supply of DNA for use in future research activity. (Pl.'s Ex. 2 at 2, 7). Here, Dr. Ware used a process known as Epstein-Barr Virus ("EBV") cell line transformation to create the cell line from the surplus blood samples from the BABY HUG infant participants. (*Id.* at 2). Dr. Ware reported at the annual BABY HUG Steering Committee meeting that he had established cell lines from the DNA samples collected from study participants. *Id.* Dr. Ware conceded that had been doing so since 2003, but he alleged that Dr. Bonds was aware that he was doing so and "readily agreed" to the creation of the immortalized cell lines. (Pl.'s Ex. 4 at A-12). Dr. Ware initially took leftover blood for the cell immortalization project, but when the process was consuming more blood that he had expected, he requested that medical centers involved in the study send him an extra ½ teaspoon of blood. *Id.*

safeguarding the interests of study participants, ordered on October 5, 2005 that the cell lines be destroyed. (Pl.'s Ex. 9; Pl.'s Ex. 4 at A-18). On October 18, 2005, Dr. Bonds and Dr. Peterson met with Dr. Elizabeth Nabel, the Director of NHLBI, to discuss the cell lines. (Pl.'s Ex. 1 ¶ 21). Initially, Dr. Nabel supported the position of Dr. Bonds, and a decision was made to support the destruction of the immortalized cell lines Dr. Ware had created. (Pl.'s Ex. 4 at A-3).

The decision to destroy the cell lines, however, was left to the individual Internal Review Boards ("IRBs") at BABY HUG clinical sites at each medical center and/or research hospital that was involved in the study. (Pl.'s Ex. 4 at 8, 14-16). Some IRBs chose to seek consent from the study participants for the creation of these lines, while others chose to interpret the existing consent forms as sufficient to permit the creation of these cell lines. *Id.*

Dr. Ware contends that Dr. Bonds was fully aware that the cell lines were being created and that she "readily agreed" to their creation. (Pl.'s Ex. 4 at A-12). He states that he discussed the cell lines at length with Dr. Bonds before creating them, and that he was used as a scapegoat when it was determined that the consent form signed by participants in the study did not cover the creation of the cell lines. *Id.*

On December 27, 2005, Dr. Bonds contacted the Office of Special Counsel ("OSC") concerning the cell lines and an investigation ensued. (Pl.'s Ex. 4 at 1).

**Removal of Dr. Bonds as the PO for the SWiTCH Clinical Trial**

Dr. Ware subsequently wrote to Dr. Moore and requested that Dr. Bonds be removed as the PO for the SWiTCH trial because of his "ongoing negative experiences with [Dr. Bonds] in other NHLBI-sponsored studies." (Def.'s Ex. 3 at 2). In his affidavit, Dr. Ware states that his prior experiences with Dr. Bonds

had been decidedly negative [and] the relationship had recently deteriorated further - certain issues relating to the creation of [immortalized cell lines] in BABY HUG had come up in early September 2005, and Dr. Bonds's accusatory, abrasive manner, implying disingenuous motive on my part, had further damaged our working relationship. *Id.*

Dr. Ware also cited her "abrasive, controlling style of managing the study" and "confrontational" attitude, and he alleged that she had a history of misrepresenting statements by the DSMB and the Chair of the Steering Committee. *Id.* at 3. Dr. Winifred Wang also complained to Dr. Moore about the problematic performance of Dr. Bonds as the PO of BABY HUG, which included, among other things: (1) her lack of communication; (2) her misrepresentation of information about the study; and (3) her refusal to comply with the approval process of each study center's Institutional Review Board when she wanted to make changes to the study. (Def.'s Ex. 4 at 2). Her alleged mismanagement of the BABY HUG study and her penchant for misleading communications was corroborated by Dr. Susan Shurin, chair of the DSMB. (Def.'s Ex. 5 at 2-3). Dr. Shurin stated that the Principal Investigators in several studies had reported that Dr. Bonds made "informal and misleading communication of DSMB recommendations [which] undermined the formal systems within the Institute for ensuring the safety of participants and the integrity of the study." *Id.* at 3.

On October 11, 2005, Dr. Moore informed Dr. Bonds that she was being removed as the Program Officer for the SWiTCH clinical trial. (Def.'s Ex. 7 at 3). On October 28, 2005, Dr. Bonds filed an EEO complaint regarding her removal. (Pl.'s Ex. 19 at 1). In her EEO complaint, she alleged discrimination and retaliation by Drs. Peterson and Moore, and by Dr. Liana Harvath, who was the Deputy Director of the DBDR. *Id.*

**Subsequent Removal of Dr. Bonds as the PO for the BABY HUG Clinical Trial**

On November 15, 2005, Dr. Moore temporarily removed Dr. Bonds as the PO of BABY HUG. (Pl.'s Ex. 8). He explained that the temporary removal was done in response to "concerns raised regarding the work that Dr. Bonds had performed in her position as the Project Officer (PO)" and was intended to allow an inquiry into the concerns. *Id.* This removal came two weeks after Dr. Bonds filed her EEO complaint against Drs. Moore and Peterson and one month after her removal as the PO for the SWiTCH trial. *Id.* This temporary removal was determined to be necessary so that the NHLBI could investigate the serious allegations against her. *Id.* The investigation was conducted by Dr. Moore and William Rudman, who was an outside attorney hired by the NIH. (Pl.'s Ex. 110 at 164-65).

**The Investigation**

The office computer used by Dr. Bonds was examined during the subsequent inquiry. (Pl.'s Ex. 136; Def.'s Ex. 7 at 22). Investigators discovered that Dr. Bonds had sent sensitive non-public NHLBI documents to her attorney, her priest, a former employee involved in employment litigation against NHLBI, and her "spiritual counselor at church." (Def.'s Ex. 14 at 4-6). This information allegedly included "budget figures related to upcoming negotiations with potential contractors," a "spreadsheet listing contractors and expenditures," the study's total projected budget, and other potentially damaging information. *Id.* at 4. In March of 2006, after these disclosures were discovered, Dr. Bonds was placed on paid administrative leave. (Def.'s Ex. 7 at 8). Dr. Bonds conceded making these disclosures but contended that these documents were not confidential, and that the persons to whom she disclosed the information "had ethical and moral obligations to

preserve the confidentiality of what [she] confided to them."  (Def.'s Ex. 15 at 4-5).

On February 21, 2006, Dr. Moore sent a memo to Dr. Bonds instructing her that she should (1) work on nothing but cleaning her office for fifteen days; (2) use her computer only for communication related to "MSH trial follow up extension;" (3) copy Dr. Moore on all email communications; and (4) keep her office door open at all times during work hours. (Pl.'s Ex. 20). On February 23, 2006, Dr. Bonds emailed Dr. Peterson and informed him that she planned to attend a grant study section meeting outside of NIH that was scheduled to review her grants portfolio. (Pl.'s Ex. 21 at 4).  Dr. Peterson allegedly called Dr. Bonds out of the meeting and "threatened her with AWOL (absent without official leave) if she failed to return to her office." (Pl.'s Ex. 1 ¶ 20).

On March 27, 2006, the FDA placed a "Full Clinical Hold" on the BABY HUG trial. (Def.'s Exs. 12-13).  The clinical hold had a devastating effect on the study as well as the study participants. (Def.'s Ex. 14 at 3; Def.'s Ex. 13 at 2).  Investigators around the country were instructed "to cease further enrollment in the trial and to remove all patients from existing drug/placebo." *Id.* This meant that "it [wa]s very possible that removal of the drug from infants may allow organ damage to proceed during this hold period and potentially reduce the chances of determining a statistical difference in the primary outcomes, namely, spleen and kidney function." (Def.'s Ex. 14 at 3).  The FDA halted the BABY HUG trial because of its concerns about the safety of the drugs and the "[u]nreasonable and significant risk of illness or injury to human subjects," which was due to the absence of expiration dates on bottles containing the drug being tested in the study.  (Def.'s Ex. 12).

Prior to the clinical trial stage, Dr. Bonds had submitted an Investigational New Drug ("IND") application to the FDA for what would later become known as the BABY HUG clinical

trial.  (Def.'s Ex. 14 at 2).  In that application, Dr. Bonds submitted labels for the study treatment bottles, which displayed an expiration date for the drug inside.  Dr. Bonds was the only project officer listed on the IND application, and she was named "as the person responsible for monitoring the conduct and progress of the clinical investigation."  *Id.*  Three NIH employees who were involved with the preparation of the drug for the clinical trial, Michael Soler (a Quality Assurance Specialist), Annette Quinones (Chief of Quality Assurance), and Thomas Shaffer (Project Coordinator), testified by affidavit that Dr. Bonds instructed them to remove the expiration date from the labels on the bottles.  (Def.'s Ex. 16 at 2; Def.'s Ex. 17 at 2; Def.'s Ex. 18 at 1; Def.'s Ex. 19 at 1; Def.'s Ex. 20 at 2; Def.'s Ex. 21 at 1). Dr. Bonds denies that she ever ordered anyone to remove the expiration dates from the bottles and contends that Soler, Shaffer, and Quinones provided inconsistent accounts and that she was never asked for her version of events, which she maintains is a violation of NIH policy.  (Def.'s Ex. 15 at 2).

Dr. Bonds also allegedly failed to follow the IND application procedure with regard to the distribution and testing of the lots of the drug at issue.  The IND application required that within one year of manufacture, the first lot of the drug would be returned and replaced with a second lot in order to ensure that the drug did not lose its efficacy and potency as well as to ensure that it did not become toxic.  (Def.'s Ex. 14 at 3).  The removal of the expiration dates from the drugs in the first lot allowed them to be used for "more than 18 months *after* the 12 month expiration period." (Def.'s Ex. 14 at 4).  The NIH concluded that Dr. Bonds had acted negligently in allowing the drug to continue to be dispensed to infants for more than two and a half years, which "jeopardized the[ir] safety and health."  *Id.*

**Termination of the Employment of Dr. Bonds**

On May 12, 2006, Dr. Moore issued a Proposal to Remove Dr. Bonds from her position. (Def.'s Ex. 14; Def.'s Ex. 22 at 6). The proposal charged that she had (1) performed her duties negligently by removing the expiration dates from the BABY HUG labels; (2) made unauthorized disclosures of sensitive agency documents to outside parties; (3) failed to follow Dr. Roth's instructions to maintain the chain of command regarding the cell lines, and failed to return copies of documents which were described in charge 2; and (4) failed to follow internal policies. (Def.'s Ex. 14 at 1, 6-14).

On October 18, 2006, Dr. Peterson sustained Dr. Moore's proposal to remove Dr. Bonds and notified her that her employment was terminated. (Def.'s Ex. 23). Although Dr. Peterson did not agree with each of Dr. Moore's charges, he reviewed the documentary evidence in the file and sustained the findings that Dr. Bonds had (1) given the instruction to remove the expiration dates from the bottles; and (2) released sensitive documents to outside parties without authorization. *Id.* at 1-2. Dr. Peterson found that Dr. Bonds had been responsible for ensuring that the drug lots were replaced and retested. *Id.* at 2-3. After reviewing the NIH Table of Penalties, Dr. Peterson found that the two instances of behavior by Dr. Bonds that amounted to "gross negligence" that supported her removal, as either one of those instances alone would suffice to warrant her removal. *Id.* at 5.

The agency asked Timothy Wheeles, who was a management official (Deputy Executive Officer) with the NHLBI, to review Dr. Peterson's decision to terminate Dr. Bonds because Wheeles had not been involved in the events leading up to her termination. (Def.'s Ex. 25 at 2). Upon review of the documentary evidence, Wheeles "supported Dr. Peterson's conclusion that [Dr. Bonds] was

negligent in failing to properly oversee various aspects of the [BABY HUG] trial, including the stability testing and other aspects of the study, . . . [which] led eventually to the FDA's putting the BabyHug [sic] project on hold, an extremely serious occurrence with Clinical Studies" and concurred with the decision to terminate Dr. Bonds.   *Id.*

### B.     PROCEDURAL HISTORY

Dr. Bonds filed her Complaint on September 12, 2007. [Paper No. 1].  On February 28, 2008, Defendants filed their Initial Motion to Dismiss or, in the Alternative, for Summary Judgment. [Paper No. 9].  On April 25, 2008, Dr. Bonds filed her Opposition to the Defendants' Motion and a Rule 56(f) affidavit. [Paper Nos. 15 & 16].  On June 5, 2008, Defendants filed their Reply. [Paper No. 24].  The Court held a hearing on August 18, 2008, and issued an Order the following day that dismissed Count I (Hostile Work Environment), denied Defendants' Motion as to Counts II (Retaliation) and III (Discrimination) without prejudice to renew after discovery, withdrew Defendants' Motion as to Count IV (Whistleblower Protection Act), and dismissed Count V (Civil Service Reform Act) without prejudice to the right to seek reconsideration after discovery. [Paper No. 29].  The Court's order permitted limited discovery in the form of depositions of Drs. Blaine Moore, Charles Peterson, Elizabeth Nabel, Russell Ware, Michael Terrin, Herman Branson, and

Jean Henslee-Downing, in addition to Michael Soler, Tom Shaffer, and Annette Quinones.[4]  *Id.*

Pursuant to the Court's Order, the parties engaged in the limited discovery that was authorized.  On December 18, 2008, Defendants filed their Renewed Motion to Dismiss or, in the Alternative, for Summary Judgment. [Paper No. 32].  That same day, Dr. Bonds filed her Motion for Reconsideration of the Dismissal of Count V (CSRA).  [Paper No. 33].  The parties timely filed their Oppositions and Replies to these motions.  On March 23, 2009, Dr. Bonds filed a Motion to Strike the Defendants' Renewed Motion in addition to another Rule 56(f) Affidavit requesting additional discovery and seeking to submit a declaration.  [Paper No. 56].

The Court held a hearing on these motions on March 30, 2009.  Pending before the Court are Defendants' Renewed Motion to Dismiss or, in the Alternative, for Summary Judgment [Paper No. 32], Plaintiff's Motion for Reconsideration of the Order Dismissing Count V (CSRA) [Paper No. 33], and Plaintiff's Motion to Strike Defendants' Renewed Motion [Paper No. 56].

---

[4]The attorney for Dr. Bonds had submitted a Rule 56(f) affidavit, which noted that the additional depositions allegedly were necessary because:

(1) Drs. Blaine Moore and Charles Peterson were the individuals responsible for removing Dr. Bonds from her supervisory positions and for Dr. Bonds's termination;

(2) Dr. Elizabeth Nabel was the Director of the National Heart, Lung and Blood Institute at the time of the events;

(3) Dr. Russell Ware was the individual allegedly responsible for establishing the immortalized cell lines and the individual who requested that Dr. Bonds be removed as the PO for SWiTCH;

(4) Mike Soler, Tom Shaffer, and Annette Quinones were the individuals who stated that Dr. Bonds had ordered the removal of the expiration date from the labels on bottles in the BABY HUG study;

(5) Drs. Terrin and Yu were the individuals that Dr. Bonds believed could refute the allegation that she ordered the removal of the expiration dates on BABY HUG bottles; and

(6) Drs. Branson and Henslee-Downing were individuals that Dr. Bonds believed could testify to prior discriminatory treatment of NIH employees by Dr. Peterson.

## II.  STANDARD OF REVIEW

### A.     MOTION TO DISMISS

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the sufficiency of the complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1969 (2007), the Supreme Court declared the "retirement" of the long-cited "no set of facts" standard first announced in *Conley v. Gibson*, 355 U.S. 41 (1957).[5]  The Court in *Twombly* looked instead to whether the Petitioner alleged "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570 (observing that "[p]etitioner's obligation to provide grounds for his entitlement to relief requires more than labels and conclusions, and formalistic recitation of the elements of a cause of action will not do").  In sum, "factual allegations must be enough to raise a right to relief above a speculative level."  *Id.* at 555; *see also Ashcroft v. Iqbal*, No. 07-1015, 556 U.S. ____, slip op. at 14-15 (May 18, 2009) (holding that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

No matter the standard used, the Court must consider all well-pled allegations in a complaint as true, *see Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe factual allegations in the light most favorable to the Petitioner, *see Lambeth v. Bd. of Comm'rs of Davidson County*, 407 F.3d 266, 268 (4th Cir. 2005).  Nevertheless, the Court is not required to accept as true "a legal

---

[5]*Conley* stated that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the Petitioner can prove no set of facts in support of his claims which would entitle him to relief."

conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), conclusory allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979), or "allegations that are merely conclusory, unwarranted deductions of fact or unreasonable inferences," *Veney v. Wyche*, 293 F.3d 726 (4th Cir. 2002). If "matters outside the pleading are presented and not excluded by the court, the motion shall be treated as one for summary judgment." Fed. R. Civ. P. 12(d).

## B.    MOTION FOR SUMMARY JUDGMENT

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A material fact is one that 'might affect the outcome of the suit under the governing law.'" *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

To avoid summary judgment on a properly supported motion, the nonmoving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256. Of course, the Court must view the evidence in the light most favorable to the nonmoving party. *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir.2006). Nevertheless, this Court recognizes the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999

F.2d 774, 778–79 (4th Cir.1993) (quoting *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987)); *Celotex Corp.*, 477 U.S. at 323–24 (internal quotation marks omitted)).

## III.   ANALYSIS

### A.   TITLE VII CLAIMS: COUNT TWO (RETALIATION) & COUNT THREE (DISCRIMINATION)

Dr. Bonds contends that Defendants violated the provisions of Title VII when they discriminated against her on the basis of her age, race, sex, and physical disability, and retaliated against her for asserting her claims under Title VII.  The Court will  first address whether Dr. Bonds has satisfied her burden of articulating a prima facie case; the Court will then determine whether Defendants have articulated legitimate nondiscriminatory and nonretalitory reasons, and finally the Court will determine whether Dr. Bonds has satisfied her burden of demonstrating that those reasons are pretextual.

### 1.   Discrimination

The Court will first address the claim that NHLBI discriminated against Dr. Bonds on the basis of her age, race, sex, and physical disability by removing her as the PO of the SWiTCH and BABY HUG trails, investigating her, placing her on administrative leave and ultimately removing her from federal service in contravention of Title VII.  This claim is governed by section 717(a) of Title VII, which provides that "[a]ll personnel actions affecting" certain federal employees "shall be made free from any discrimination based on race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-16(a).  As for private-sector employees, section 703(a)(1) of Title VII makes it unlawful for their employers "to discharge any individual . . . because of such individual's race, color, religion, sex or national origin."  *Id.* § 2000e-2(a)(1).  The United States Court of Appeals for the Fourth Circuit has explained that "[a]lthough phrased differently, section 703(a)(1) and 717(a)

have generally been treated as comparable, with the standards governing private-sector illegal claims applied to such claims brought by federal employees." *Baqir v. Principi*, 434 F.3d 733, 742 (4th Cir. 2006) (citing *Page v. Bolger*, 645 F.2d 227, 233) (4th Cir. 1981) (en banc)); *accord Bundy v. Jackson*, 641 F.2d 934, 942 (D.C. Cir. 1981) ("Despite the difference in language . . . , we have held that Title VII places the same restrictions on federal . . . agencies as it does on private employers, and so we may construe the latter provision in terms of the former.") (citation omitted).

To defeat summary judgment, a plaintiff must present either direct or circumstantial evidence of discrimination. Here, Dr. Bonds does not present any direct evidence of discrimination so her claim must be evaluated under the familiar *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Dr. Bonds has the initial burden of establishing a prima facie case of discrimination. *Id.* This requires proof that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by a similarly qualified applicant outside the protected class." *Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 285 (4th Cir. 2004) (en banc). Establishing a prima facie case gives rise to an inference of discrimination, and the burden then shifts to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.*. This burden is not one of persuasion, but rather one of production. *Id.* Once the employer has met its burden, the *McDonnell Douglas* framework disappears and the only remaining issue is whether there is discrimination *vel non*, which requires the plaintiff to demonstrate by a preponderance of the evidence that the employer's stated reasons were a pretext

for discrimination.  *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142 (2000)).

> ### i)      Prima Facie Case

Here, it is undisputed that Dr. Bonds is a member of a protected class.  Assuming without deciding that she is able to satisfy the other elements of the prima facie case – that she was performing her job duties at a level that met the employer's legitimate expectations at the time of the adverse employment action and that her position remained open or was filled by a similarly qualified applicant outside the protected class – Dr. Bonds has failed to demonstrate that she suffered an adverse employment action with regards to some of the challenged conduct.

As an initial matter, it is undisputed that her ultimate removal from federal service constitutes an adverse employment action for purposes of establishing a prima facie case.  *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 253 (4th Cir. 1998).  However, Dr. Bonds also contends that Defendants' acts of (1) removing her as the PO of the SWiTCH and BABY HUG trials; (2) investigating her; and (3) placing her on administrative leave are adverse employment actions.

The removal of Dr. Bonds as PO of the BABY HUG and SWiTCH trials arguably might constitute adverse employment actions, but only if Dr. Bonds had been able to demonstrate what her prospects would have been absent her disclosure of sensitive pricing information and absent the FDA's clinical hold on the BABY HUG trial.  *Cf. James v. Booz-Allen & Hamilton*, 368 F.3d 371, 377(4th Cir. 2004) (holding that plaintiff-appellant who departed the company before being considered for a promotion left the Fourth Circuit to "guesswork and conjecture as to what his prospects would have been.").  Likewise, here, it is unclear what the prospects of Dr. Bonds might have been in the absence of intervening events, which were her disclosure of sensitive information

and in the absence of the clinical hold on the BABY HUG trial, which will be discussed in greater detail *infra*. Dr. Bonds has adduced no contrary evidence, apart from her bare allegations and her contention that her removal as the PO during the middle of a trial was "unheard of." *See* Pl.'s Opp. to Def.'s Mot. Summ. J. 44. In support, Dr. Bonds cites only her own self-serving assertions as contained in her complaint and depositions, Pl.'s Ex. 33 ¶ 14; Pl.'s Ex. 1 ¶ 14, but fails to adduce any factual support otherwise for that proposition; rather the information she adduces suggests that project officers have been removed from trials before. (Pl.'s Ex. 37 at 45) (Nov. 3, 2008 Nabel Dep.). Accordingly, Dr. Bonds has failed to satisfy her burden of demonstrating that her removal as the PO of the two trials constituted an adverse employment action.

Dr. Bonds also contends that the investigation undertaken by the Defendants was an adverse employment action. She asserts that "[t]he investigation, standing alone, is sufficient to establish a violation of Title VII." Pl.'s Opp. to Def.'s Mot. Summ. J. As a threshold matter, Dr. Bonds has failed to exhaust her administrative remedies because she did not include the claim regarding the investigation in her EEO Complaint even though she could have raised it at the time because she was aware of the investigation and even though she amended her 2005 EEO Complaint *twice and* then filed a new EEO Complaint after her termination. Ex. 27; *Riley,* 872 F. Supp. at 1459-60. Her multiple amendments of her EEO Complaint and filing of a new EEO Complaint undercut a finding that she (or a reasonable employee) would have felt inhibited by the discrimination.

The typical rule that a retaliation claim may be raised in the district court that was not included in the EEO complaint is inapplicable here because her alleged retaliation claim could have been raised in the original EEO complaint. *See Riley*, 872 F. Supp. at 1459-60; *Nealon v. Stone*, 958 F.2d 584 (4th Cir. 1992). The record demonstrates that Dr. Bonds amended her EEO complaint

*twice* and then filed a new EEO complaint *after* her termination yet never mentioned the investigation conducted against her as a basis for retaliation.  *See* (Def.'s Ex. 27).  Though Dr. Bonds was unaware of the investigation against her until she received the proposal to remove her, she had received that proposal by the time she filed her second EEO complaint and could have raised it then yet chose not to do so.  *See, e.g. Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054 (9th Cir. 2002) (holding that plaintiff's retaliation allegations were not properly before the court because they all occurred before his termination and he could have raised these alleged instances of retaliatory conduct in his earlier charge for retaliation for filing a sexual harassment complaint).  Her failure to raise and include the claim regarding the investigation in either her amended EEO complaint or second EEO complaint also undermines any inference that this purported adverse employment action was such that under *White* it would have inhibited a reasonable employee from exercising her EEO rights; to the contrary, the facts here demonstrate the opposite.

Even if the exhaustion requirement had been was satisfied, Dr. Bonds nevertheless has not supported her claim that the investigation of her work computer was improper with the requisite facts to oppose Defendants' Motion for Summary Judgment.  *See* Pl.'s Opp. to Def.'s Mot. Summ. J. 45.  Nor has Dr. Bonds rebutted the fact that NIH's policy provides that "[s]taff cannot expect a right to privacy while using government-provided IT resources or equipment at any time" because administrators and supervisors, *inter alia*, may access information if there is a "reasonable suspicion" that an individual is using NIH IT resources in an unauthorized or illegal manner.  *See* (Def.'s Ex. 36).  Dr. Bonds similarly has not rebutted the existence of a warning pop-up screen that

appeared on NHLBI computer screens at start-up that relayed substantially the same information.[6] (Def.'s Ex. 37).  In the Fourth Amendment context, the Fourth Circuit has held that such policies and pop-up screens undermine a reasonable expectation of privacy in government computers.  *See, e.g. United States v. Simons*, 206 F.3d 392, 398-99 (4th Cir. 2000) (denying motion to suppress evidence from government computer).  Similarly, any assertion of privilege in the email communications is undermined and the privilege rendered inapplicable by the existence of a warning in the pop-up screen.  *See United States v. Etkin*, No. 07-CR-913 (KMK), 2008 WL 482281, at *3-*4 (S.D.N.Y. Feb. 20, 2008) (holding that "[b]y virtue of the log-on notices, Defendant is properly charged with knowledge of the fact that any email he sent to his wife from his work computer could be read by a third party" and that the marital privilege was inapplicable).

It is a somewhat closer question in the Fourth Circuit whether placement on administrative leave constitutes an adverse employment action.  *Compare Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir.2001) (placing employee on administrative leave during investigation of complaint lodged against employee is not an adverse employment action) *with Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1229 (4th Cir.1998) (including in a listing of adverse employment actions taken by the employer an investigation of the plaintiff that did not result in a loss of pay or termination).  The Court need not however resolve this issue because, as discussed in greater detail *infra*, the Court finds that even for those actions that might constitute an adverse employment action,

---

[6] Dr. Bonds claims that she does not remember seeing the pop-up screen or the internet policy, but her self-serving allegations, even if taken as true, do not suffice to create a genuine issue of material fact on this issue.  *See Angel Med. Ctr., Inc. v. Abernathy*, 1 Fed. Appx. 217, 217-18 (4th Cir. 2001) (holding that plaintiff failed to present sufficient factual evidence of contractual accord and satisfaction apart from "his own bald self-serving allegations, which are insufficient to avoid summary judgment.").

Dr. Bonds has failed to adduce evidence demonstrating that Defendants' asserted reasons for these actions were a pretext for discrimination.

Finally, the Court notes that the laundry list of minor slights and grievances that Dr. Bonds challenges, which include limitations on her use of a computer, her ability to attend meetings, her ability to close her office door, and the requirement that she return her badge, are nothing more than the everyday inconveniences of working with others in a professional setting and, as such, they do not, either individually or collectively, rise to the level of adverse employment actions.[7] *See, e.g. Moret v. Green*, 494 F. Supp. 22 329, 343 (D. Md. 2007) (holding that denial of use of a computer did not constitute an adverse employment action); *Santa Cruz v. Snow,* 402 F. Supp. 2d 113, 122 (D.D.C. 2005) (holding that requirement that employee keep her office door open during the day did not constitute an adverse employment action); *Simmons v. Dep't of Cent. Mgmt.* Servs., No. 02-C-9492, 2004 WL 2584801, at *7 (N.D. Ill. Nov. 10, 2004) (holding that employer's requirement that plaintiff-employee turn in her badge and weapon while not on active duty due to injury was not an adverse employment action); *Benningfield v. City of Houston*, 157 F.3d 369, 370 (5th Cir. 1998) (holding that the denial of opportunity to attend conferences was not an adverse employment action). The Supreme Court has also cautioned that Title VII does not establish a "general civility code for the American workplace."  *Oncale,* 523 U.S. at 80; *see also Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (stating that Title VII does not immunize employees from

---

[7]The Court also notes that Dr. Bonds has essentially repackaged the conduct she alleged as part of her hostile work environment claim as additional adverse actions.   The Court dismissed her hostile work environment claim on August 19, 2008.   For the reasons stated on the record at the August 19, 2008, hearing on Defendants' Original Motion to Dismiss or, in the Alternative, for Summary Judgment, this count remains dismissed and will not be addressed herein.

"petty slights, minor annoyances, and simple lack of good manners"). Therefore, "complaints premised on nothing more than rude treatment by coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor, are not actionable under Title VII." *Sunbelt Rentals, Inc.*, 521 F.3d at 316. Finally, even if Defendants' other acts were to qualify as adverse employment actions, for reasons stated in greater detail below, Dr. Bonds has failed to demonstrate that Defendants' proferred reasons for these actions were pretextual.

**ii)    Employer's Proffered Reasons**

Even assuming *arguendo* that the Defendants' actions qualify as adverse employment actions (her ultimate removal certainly does), the Defendants have articulated multiple legitimate non-discriminatory reasons for the decision to remove Dr. Bonds as the PO for the SWiTCH and BABY HUG trials in addition to the ultimate decision to remove her from federal service.

In terms of her removal as the PO for the SWiTCH trial, Dr. Moore explained, in the memorandum he issued on the same day as the removal of Dr. Bonds on October 11, 2005, that his decision to do so was based upon "multiple factors," which included his concerns that (1) Dr. Bonds would be overwhelmed by managing the trial given her existing responsibilities; (2) her "dogmatic and inflexible approach in overseeing the BABY HUG trial might carryover [sic] into the SWiTCH trial where her primary role should be observational and facilitative;" and (3) her "strained relationship" with Dr. Ware as a result of the immortalized cell line situation in the BABY HUG trial would also "carry over" into their future working relationship in the SWiTCH trial, in addition to (4) Dr. Ware's belief that he and his colleagues "would have serious difficulty conducting their trial without intervention by Dr. Bonds;" (5) Dr. Ware's written request, drafted in consultation with his SWiTCH trial colleagues, to have Dr. Bonds replaced as the PO on the SWiTCH trial; and (6)

that it would be "better" to change POs at "the beginning of the trial rather than the middle." (Def.'s Ex. 7 at 3; *see also* Def.'s Ex. 28 (Moore Dep.) at 87-89, 118-20, 145-46). Dr. Moore's removal proposal was consistent with his deposition testimony. *Compare* (Def.'s Ex. 7 at 3) *with* (Def.'s Ex. 28 at 87-89, 118-20, 145-46). Moreover, Dr. Ware testified that not only was Dr. Bonds aware of the creation of the immortalized cell lines but that she approved it in 2003. (Pl.'s Ex. 99 at 99-137). This assertion is supported by unrefuted email evidence in 2004. (Pl.'s Ex. 103). Dr. Ware believed that the accusations by Dr. Bonds that he created the immortalized cell lines in defiance of her orders, when he contends he created them in accordance with her input and approval, strained their working relationship and thus requested a different project officer. (Pl.'s Ex. 99 at 99-137).

The removal of Dr. Bonds as PO of the BABY HUG was based upon her supervisors' awareness of " a number of concerns over long periods of time" that her colleagues had voiced informally about her performance and their belief that they needed to investigate to determine whether these concerns had merit. Def.'s Exs. 28 at 149, 169-70; *see also* Def.'s Exs. 29, 30; Def.'s Ex. 34 (including the same concerns in Dr. Bonds's mid-year performance evaluation if Dr. Bonds in July 2005); Pl.'s Ex. 117 at 3 (noting *inter alia* that the "lines of communication have been ignored by [Dr. Bonds] on many occasions."). These concerns had also been documented in the mid-year performance review of Dr. Bonds , which had occurred four months prior, in July 2005. (Def.'s Ex. 34). Dr. Moore explained that they planned to "temporarily remove [Dr. Bonds as PO] while we had an inquiry . . . into people's concerns about her interactions and the trial" so that they could interview her subordinates and colleagues in the BABY HUG trial without Dr. Bonds being in a position to influence or affect what those persons might say to ensure a fair and accurate investigation of the charges against her. (Def.'s Ex. 34 at 171, 173-74; Def.'s Ex. 28 at 187).

During the time period of the investigation, NHLBI officials became aware of two serious instances of misconduct attributable to Dr. Bonds that formed the main bases for Dr. Moore's recommendation that Dr. Bonds be removed from federal service.  (Def.'s Ex. 14).

First, the NHLBI's investigation revealed that Dr. Bonds had transmitted confidential and sensitive NHLBI materials, which would typically not be available under the Freedom of Information Act and were considered not to be released, to persons outside of the NHLBI because some of this released information concerned pricing on a negotiated contract.  (Def.'s Exs. 10 & 11).

Second, during this timeframe, the FDA informed the NHLBI that it was going to place a clinical hold on the BABY HUG study because of a discrepancy between the expiration dates on the labels for the drug that had been submitted to the FDA and the labels that were actually being used that did not have an expiration date.  (Def.'s Ex. 12).  Dr. Moore interviewed individuals regarding their recollections about the details about the absence of the expiration dates on the bottles and those individuals "verified to [him] that they had been instructed to take the expiration date off the label" by Dr. Bonds.  (Def.'s Ex. 28 at 191).

Dr. Moore's recommendation to remove Dr. Bonds as a result of these two occurrences was reviewed by his and her second-line supervisor, Dr. Peterson.  (Def.'s Ex. 23).  Ultimately, Dr. Peterson disagreed with several of Dr. Moore's findings/recommendations, but concurred with the recommendation to remove Dr. Bonds from federal service.  *Id.*  Moreover, NHLBI commissioned Timothy Wheeles, who was a management official at NHLBI who had not worked with Dr. Bonds or been involved in either the BABY HUG or SWiTCH trials, to review the proposal to remove Dr. Bonds.  *Id.*  The Court finds that the Defendants have fully satisfied their burden of articulated legitimate reasons for their actions taken against Dr. Bonds that are not discriminatory or retaliatory

or based in any way on impermissible considerations of age, race, sex, and physical disability under Title VII.

### iii)    Burden of Demonstrating Pretext

To begin with, Dr. Bonds has failed to demonstrate that NHLBI's proffered reasons for her removal as the PO for the BABY HUG and SWiTCH trials and her ultimate removal from federal service were pretextual.  Dr. Bonds claims that NHLBI's beliefs were inaccurate and insists that she actually performed her job well at NHLBI.  But when an employer satisfies its burden of providing a legitimate, non-discriminatory reason for discharging the plaintiff, "it is not [the Court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination."  *DeJarnette v. Corning, Inc.,* 133 F.3d 293, 299 (4th Cir. 1998) (internal quotation marks omitted).

In a similar case, the Fourth Circuit held that, when assessing pretext, the Court's focus must be on the decisionmaker's perception, namely whether the decisionmaker's belief in its stated reason was credible.  *Holland v. Washington Homes, Inc.,* 487 F.3d 208, 217 (4th Cir. 2007).  In *Holland,* the employer terminated the plaintiff based upon the president of the corporation's honest belief that the employee had threatened his supervisor.  *Id.*  The Fourth Circuit held that because the plaintiff's evidence "failed to address whether [the decisionmaker] did not honestly believe that the threats were made," "on the evidence in the record, no reasonable juror could conclude that Washington Homes' 'proferred explanation is unworthy of credence.'"  *Id.* (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).  It follows *a fortiori* that, if an employer has a good faith belief in its proffered reason, a plaintiff has not established discrimination simply by showing that the employer was factually incorrect.

Here, Dr. Bonds has adduced no legally sufficient evidence to establish that the Defendants' multiple legitimate, nondiscriminatory reasons for its actions were a pretext for bias against her due to her race or gender.  The uncontradicted evidence in the record, taken in the light most favorable to Dr. Bonds, fails to meet the degree of proof that the employer's articulated reasons are pretextual. More to the point, even if the Defendants' reasons were based upon erroneous information, Dr. Bonds has failed to demonstrate that Defendants' beliefs were not honestly held.

First, with regard to the disclosure of NHLBI information, though Dr. Bonds contends that "the manner in which [she] released the documents did not violate FOIA regulations" and that therefore "the decision not to terminate [her] when the release of the documents occurred demonstrates that the Defendants did not believe that the circumstances surrounding the release of the documents made it a terminable offense," Pl.'s Opp. to Def.'s Mot. Summ. J. 46, none of these contentions is supported by the facts in the record before the Court.  To the contrary, the unrebutted evidence in the record before the Court is that Dr. Bonds had transmitted confidential and sensitive NHLBI materials, which would typically not be available under the Freedom of Information Act and were considered information not to be released, to persons outside of the NHLBI because some of this released information included negotiated costs and line item costs.  (Def.'s Exs. 10, 11, 14 at 4-6, 45-47, 48).  This sensitive pricing information "was prepared for internal review and approval upon which contracting funding decision would be made [and a]t the time the spreadsheet was prepared, the contract program was about to renegotiated" such that "[r]elease of this information prior to the negotiation and award of the contract modifications may have or could have been prejudicial to the outcome of the negotiations since the spreadsheet identified the overall amount of funding balance available to the program."  (Def.'s Ex. 14 at 4-5).  As a result, this information

would have been withheld from disclosure under FOIA.  (Def.'s Exs. 10 & 11).

Furthermore, the contention by Dr. Bonds that she disclosed the information pursuant to the attorney-client privilege or her attorney's "First Amendment right to communicate" does not change the underlying unrebutted fact that she disclosed information that she should not have disclosed. *See* Pl.'s Opp. to Def.'s Mot. Summ. J. 55, 57.  Though Dr. Bonds makes conclusory allegations that such release of information was commonplace and the information released was not confidential or sensitive, she has failed to adduce anything more than her self-serving allegations contained in her legal memoranda or complaint; she has pointed to no other instance in which a Project Officer (or any employee for that matter) released sensitive and prejudicial contract negotiation pricing information and was not disciplined.  *See* Pl.'s Opp. to Def.'s Mot. Summ. J. 56.  The fact that the documents were ultimately returned also does not change the fact that the unrebutted evidence in the record before the Court demonstrates that these documents should not have been disclosed in the first place.  Moreover, that the documents were ultimately returned or that Dr. Bonds believed that their disclosure was proper does not change the undisputed fact that Drs. Moore and Peterson did not believe that the performance of Dr. Bonds was good in this regard.  *See Hawkins*, 203 F.3d at 279.  Again, Dr. Bonds has proffered nothing more than her conclusory allegations devoid of factual support in the record, which do not suffice to create a genuine issue of material fact necessary to rebut the legitimate nondiscriminatory reasons articulated by Defendants, which are supported by the record before the Court, and thus Dr. Bonds has failed to demonstrate that this reason is pretextual.

Second, with regard to the FDA clinical hold, Dr. Bonds claims that the conclusion that she was responsible for the FDA clinical hold was pre-determined and that the subsequent investigation

was therefore pretextual. In support, she alleges that it was the pharmacists' duty (and thus not hers) to ensure that the medication being dispensed was properly labeled and that Dr. Peterson knew that the medication was missing expiration dates a year earlier but refused to investigate. Pl.'s Opp. to Def.'s Mot. Summ. J. 47.

Dr. Bonds makes much ado about the fact that the affidavits of Soler, Shaffer, and Quinones were, at some points, inconsistent regarding the events leading up to the removal of the expiration dates from the bottles of the drug, which would later form the basis of the FDA's decision to place a clinical hold on the study. Simply put, Dr. Bonds misses the point; the point for pretext purposes is not whether there were inconsistencies but whether the decisionmaker was aware of those inconsistencies when making its decision, as that might be probative of pretext. Here, there is no evidence in the record before the Court that Dr. Moore was aware of *any* inconsistencies among the accounts of events reported by Soler, Shaffer, and Quinones. *See* Def.'s Exs. 16-21. Rather, the evidence in the record is to the contrary. Dr. Moore testified that he spoke to Shaffer and Soler on the phone and was under the impression that Dr. Bonds had ordered the removal of the expiration dates from the drug bottles. Dr. Bonds has adduced no evidence that Dr. Moore was aware of any inconsistencies in their accounts of events and certainly Dr. Moore could not have in possession of their declarations, upon which she focuses her challenges, because they were executed *after* he issued his proposal to remove her from federal service on May 12, 2006. *See* Def.'s Exs. 14, 16-21. Dr. Bonds has not satisfied her burden of establishing that Dr. Moore knew of the alleged discrepancies to defeat Defendants' motion for summary judgment.

Furthermore, Dr. Peterson, who approved Dr. Moore's proposal to remove Dr. Bonds from federal service, had at one time inquired about the removal of the expiration dates from the labels

while he was the PO for the BABY HUG trial (after Dr. Bonds was removed as PO in November 2005). (Def.'s Ex. 31 at 167-73). Specifically, Dr. Peterson sought to determine if the problem was limited to the BABY HUG trial and at what point during the trial the problem has arisen. *Id.* Dr. Peterson, without Dr. Moore, also spoke with Soler, Shaffer, and Quinones all of whom also held the same belief that Dr. Bonds had ordered the removal of the expiration dates. *See* Def.'s Exs. 18-21. Dr. Bonds has similarly failed to adduce any evidence that Dr. Peterson was aware of the purported inconsistencies that are embodied in Soler, Shaffer, and Quinones's other declarations. *See* Def.'s Exs. 16, 17, 20. "Once an employer has provided a non-discriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it. The former would not create a 'genuine' dispute, the latter would fail to be 'material.'" *Hux v. City of Newport News*, 451 F.3d 311, 315 (4th Cir. 2006) (internal citation omitted).

Dr. Bonds also contends that the six-month length of the investigation is evidence of pretext. Specifically, she cites to Dr. Moore's memorandum removing her as the PO of the BABY HUG trial, which stated that "[a]n inquiry will be conducted as quickly as possible and you will have an opportunity to respond to any negative findings." (Pl.'s Ex. 8 at 1). Dr. Bonds has cited, as evidence of pretext, the fact that an investigation was both too cursory and too intense and that NHLBI failed to follow what she alleges is its internal policy of creating a charging document and that she was not informed of the allegations against her until Dr. Moore formally proposed her discharge. *See* Pl.'s Opp. to Def.'s Mot. Summ. J. 45, 47; *see also* (Pl.'s Ex. 1 ¶¶ 40-43). It is undisputed that the NIH has established some points of "guidance" regarding administrative

inquiries.  *See* Pl.'s Ex. 30 at 1-2.  A review of this "guidance" document demonstrates that the contentions of Dr. Bonds regarding the purportedly improper (and thus purportedly pretextual) nature of the investigation are factually unsupported.  This "guidance" statement provides that an administrative inquiry is undertaken for purposes of "gatherin[ing] facts and relevant evidence" relating to "incidents of misconduct which may lead to disciplinary action" "to provide the basis for management determining what, if any, action to take."  *Id.* at 2.  It explicitly provides  that the "inquiry may be conducted directly by the supervisor who is responsible for any subsequent administrative action, or the supervisor may ask an HR Specialist or *outside investigator* to conduct the inquiry."  *Id.* at 1 (emphasis added).

Here, the second-line supervisor of Dr. Bonds, Dr. Peterson, who would be responsible for any subsequent administrative action, participated in the inquiry with the aid of Dr. Wheeles, a colleague who was uninvolved in the relevant clinical trials, *and* Mr. Rudman, an outside investigator who was employed to determine the merits of the serious allegations against Dr. Bonds in the administrative inquiry surrounding the BABY HUG trial.  (Pl.'s Ex. 110 at 164-65; Def.'s Ex. 25 at 2).  The contention by Dr. Bonds that NHLBI's decision to hire Mr. Rudman (a lawyer who was not affiliated with NHLBI) to conduct the investigation is evidence of pretext because "he was given a blank slate to investigate anything he could think of to justify termination [of Dr. Bonds]," Pl.'s Opp. to Def.'s Mot. Summ. J. 45, is not only without factual support but also is undermined by the contemplation of the need for "an outside investigator" to conduct "full" and exhaustive inquiries that "do not assume" the veracity of the allegations.  (Pl.'s Ex. 30 at 1).

Moreover, the document only provides "guidance" about conducting administrative inquiries; it acknowledges that though "usually" the accused is interviewed first, there may

situations in which that may be contrary to the best interests of the investigation and thus gives the investigator the discretion on how to conduct the investigation. *See, e.g.* Pl.'s Ex. 30 at 1. Similarly, the document vests discretion in the investigator as to which interviews to conduct, in which order, whether and when the subject should notified; specifically, "[i]f you have some reason to believe it is not practical to begin your interviews with the subject, or you have some discomfort with doing so, you may have a basis for beginning your interviews with the complainant or witnesses." *Id.* While the document provides "guidance" that witnesses' statements should be memorialized in writing, which were not done thoroughly in this case, the mere fact that the Defendants did not use formal written procedures is not evidence of discrimination. *See, e.g. DAG Petroleum Suppliers, L.L.C. v. BP P.L.C.,* 268 Fed. Appx. 236, 242 (4th Cir. 2008) (quoting *Dugan v. Albemarle County Sch. Bd.,* 293 F.3d 716, 722 (4th Cir. 2002)) ("Therefore, evidence that [the employer] 'erroneously or even purposely misapplied [its own] policy,' will not suffice to overcome summary judgment."); *Beaver v. Rayonier, Inc.*, 200 F.3d 723, 729 n.2 (11th Cir. 1999), *cert. dismissed*, 529 U.S. 1095 (2000) (same).

Furthermore, Dr. Bonds has not rebutted the fact that "[a]t this investigatory stage, the employee is <u>not</u> entitled to be informed of the charges." (Pl.'s Ex. 30 at 2) (emphasis in original). As such, the contentions by Dr. Bonds that the investigation into her alleged misconduct was pretextual as it failed to follow internal NIH protocol is (1) inaccurate given the text of the "guidance" document and (2) unsupported factually given the steps the NHLBI actually took in compliance with its vested discretion and authority under the "guidance" document. Accordingly, Dr. Bonds has failed to meet her burden on summary judgment.

Dr. Bonds also has failed to demonstrate that Defendants' legitimate nondiscriminatory and

nonretaliatory reasons for removing her as the PO from the BABY HUG trial were pretextual. Rather, the removal provided the necessary opportunity for Dr. Moore to interview the colleagues and subordinates of Dr. Bonds in the BABY HUG trial without the risk and concern that Dr. Bonds would interfere or influence the investigation.  (Pl.'s Ex. 100 at 173-74, 176).  That outside counsel was involved in the investigation and that Dr. Peterson was not is not probative of pretext; rather, Dr. Peterson's lack of involvement with the investigation was reasonable given the possibility that Dr. Peterson would later serve as the  supervisor who would have to decide if and how to discipline and/or terminate Dr. Bonds based upon the results of the investigation and the NIH's internal "guidance" document contemplates the use of an outside investigator.  (Pl.'s Ex. 47 at 106; Pl.'s Ex. 30 at 1).  "In order to properly manage its business, an employer must be able to supervise, review, criticize, demote, transfer and discipline employees."  *Johnson v. Merrell Dow Pharms., Inc.,* 965 F.2d 31, 34 (5th Cir. 1992).   Dr. Bonds has not adduced any evidence to the contrary.

With regard to the allegation by Dr. Bonds that Dr. Peterson's statement to the FDA that she was responsible for the lack of expiration dates on the drug bottles *prior to* the investigation demonstrates pretext, the Court notes that Dr. Bonds has failed to demonstrate that Dr. Peterson lacked an honest belief to that effect when he made that statement.  What Title VII requires is that the employer *honestly* believe its preferred reason for taking an adverse employment action against the employee *even if* that reason later turns out to be incorrect.  *Holland*, 487 F.3d at 217.  In this case, even if Dr. Peterson had been mistaken in his belief that Dr. Bonds was responsible for the error, she has adduced no evidence that demonstrates that Dr. Peterson did not have an honest belief that she was responsible.  *Id.*  Rather, the unrebutted evidence in the record demonstrates that Dr. Bonds was the sole individual responsible for submitting to the FDA the original drug label that

included a place holder for an expiration date, which formed the basis for the FDA's issuance of an IND that permitted the study to commence using *that exact label*. (Def.'s Ex. 14 at 2-4).

It is also undisputed that as the PO of the trial, Dr. Bonds was "responsible for the management of [a] research portfolio" including "manag[ing] activities from pre-application phase through Council preparation and follow-up." (Def.'s Ex. 32 Att. 1). This included Dr. Bonds submitting the BABY HUG application to the FDA. (Def.'s Ex. 14 at 22 (Apr. 18, 2003 IND application signed by Dr. Bonds)). The application certified to the FDA that the labels would have expiration dates. (Def.'s Ex. 14 at 28-29). The clinical hold was predicated upon the fact that the labels that were used in the study did not contain expiration dates while the exemplars that had been presented to the FDA in connection with the issuance of an IND that permitted the study to commence included expiration dates. (Def.'s Ex. 13 at 2 (noting that one of the "immediate actions" to address was that "[t]he study drug label accepted by FDA in Amendment 001 of IND 67,289 that contains an expiration date will be placed on all bottles on study drug.")).

Dr. Bonds concedes that she was the individual responsible for approval because "[b]efore the drug could be administered, as the Project Officer, I had to physically receive and approve in writing the label that was to be placed on the bottles." (Pl.'s Ex. 1 ¶ 31; Pl.'s Ex. 33 ¶ 13). At no point does she dispute that she was responsible for overseeing the study – particularly its continued compliance with FDA standards, including the IND – and her contentions that others might have intervened does not change the fact that her supervisors believed that Dr. Bonds was the one ultimately accountable for the actions that formed the basis for the clinical hold, *i.e.* the lack of the expiration date.

It is also undisputed that Dr. Peterson knew about the lack of an expiration date a year prior

to the issuance of the clinical hold.  (Pl.'s Ex. 68 at 1; Pl.'s Ex. 47 at 186, 193-94).  Dr. Bonds contends that this is evidence of pretext because  it demonstrates that Dr. Peterson engaged in a "cover up" so that he could blame her for it later on.  Pl.'s Opp. to Def.'s Mot. Summ. J. at 48.  In support of that contention, Dr. Bonds contends that the problem was never brought to her attention and that it was the pharmacists' duties to ensure that the medication was dispensed with a proper label.  (Pl.'s Ex. 94; Pl.'s Ex. 1 ¶ 35; Pl.'s Ex. 47 17-19, 117-18, 186, 191-93; Pl.'s Ex. 67 at 1). Moreover, Dr. Bonds contends that some inconsistencies in the statements given by Soler, Shaffer, and Quinones demonstrate that they could not agree on how, where, and when Dr. Bonds gave the instruction to remove the expiration dates.  Pl.'s Opp. to Def.'s Mot. Summ. J. 50.  But what she has failed to rebut and dispute is that all three employees recalled that it was Dr. Bonds who directed them to remove the expiration dates from the labels *and* that this information, even if mistaken or inaccurate, was the information that NHLBI officials had when making their termination decision. (Def.'s Ex. 16 at 2; Def.'s Ex. 17 at 2; Def.'s Ex. 18 at 1, Def.'s Ex. 19 at 1; Def.'s Ex. 20 at 2; Def.'s Ex. 21 at 1).   Even if Dr. Moore and Dr. Peterson were misinformed about the role of Dr. Bonds in the removal of the expiration dates, they both held an honest belief that she was responsible and "[m]ere mistakes of fact are not evidence of unlawful discrimination."  *Price v. Thompson*, 380 F.3d 209, 215 n.1 (4th Cir. 2004); *accord Jordan v. Summers*, 205 F.3d 337, 344 (7th Cir. 2000) ("Pretext is a lie, not merely a mistake.").

When a plaintiff is fired for poor performance, she must prove that the firing official "actually believed her performance was good" in order to demonstrate pretext. *Hawkins v. PepsiCo, Inc.,* 203 F.3d 274, 279 (4th Cir. 2000).  Even if there are discrepancies in the accounts of events such that a supervisory official must choose between the versions of events, to prove pretext, the

plaintiff must be able to establish that the supervisory official did not actually believe the version of events in which the plaintiff was alleged to be culpable.  *See Holland v. Wash. Homes, Inc.,* 487 F.3d 208, 215 (4th Cir. 2007) (holding that plaintiff failed to prove pretext because of lack of proof that manager who was confronted with differing accounts of events, one of which included that plaintiff had made a threat to the vice-president, did not actually believe that plaintiff had made the threat).  The selection of one version of events over another does not prove pretext in the absence of any evidence that the belief in one version was not honestly held.  *Id.* ("[n]othing in the record supports an inference that [the manager]'s explanation was pretextual or perhaps more on point, that [the manager] did not believe that [the plaintiff] had threatened [the vice-president] when he made the decision to fire him.").

Dr. Bonds contends that her positive performance evaluations prior to her removal as PO for the SWiTCH and BABY HUG clinical trials and removal from federal service support an inference that her removals were a pretext for discrimination and retaliation.  It is undisputed that Dr. Bonds had received mostly positive evaluations during her employment at NHLBI and that during that time, she had received awards as well.  (Pl.'s Ex. 3 at 1-54; Pl.'s Ex. 15).  Yet it is also undisputed that her performance evaluations also included comments about her gruff communication style and interpersonal difficulties.  (Pl.'s Ex. 110 at 115; Pl.'s Ex. 3 at 1-54).  These positive evaluations occurred in the years *prior to* her release of confidential and sensitive NHLBI information and *prior to* the FDA placing a clinical hold on the BABY HUG trial and, significantly, *prior to* the arrival of her new supervisor Dr. Moore, who had expressed concerns about the communication and interpersonal skills of Dr. Bonds three months prior.  (Def.'s Ex. 34; Pl.'s Ex. 110 at 169).  Furthermore, Dr. Harvath's statement that the removal of Dr. Bonds "did not relate to performance

or competence" as "there was no question about [her] competency or commitment" similarly does not prove pretext; her removal was the result of her disclosure of confidential and sensitive information and the NHLBI's honestly-held belief that she ordered the removal of the expiration dates from the drug involved in the BABY HUG trial, which resulted in the FDA placing a clinical hold on the study.

Instead of producing evidence that shows NHLBI's reasons were dishonest or not the real reason for her removal as project officer for two trials and her ultimate removal from federal service, Dr. Bonds disputes the merits of the assessment of her working relationships with others and her perceived competency, which proves only the unremarkable fact that she and NHLBI disagree about the quality of her work.  The Fourth Circuit has repeatedly held that in a wrongful discharge action "[i]t is the perception of the decision maker which is relevant, not the self assessment of the plaintiff." *DeJarnette v. Corning, Inc.,* 133 F.3d 293, 299 (4th Cir. 1998).  Moreover, the alleged opinions of the co-workers of Dr. Bonds as to the quality of her work are similarly "close to irrelevant."  *Id.* (quoting *Conkwright v. Westinghouse Elec. Corp.,* 933 F.2d 231, 235 (4th Cir. 1991)).

Finally, the Fourth Circuit has held that "[a] plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action." *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 456 (4th Cir. 1989).  "[N]o court sits to arbitrate mere differences of opinion between employees and their supervisors." *Hawkins v. Pepsico, Inc.,* 203 F.3d 274, 281 (4th Cir. 2000).  "Even if [the employer or the supervisors] harbored some personal dislike of [the plaintiff] that made [her] job more difficult or stressful, '[a]n employer is not required to like his employees.'" *Hawkins,* 203 F.3d at

281 (quoting *Cerberonics, Inc.,* 871 F.2d at 457); *accord Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 567 (7th Cir. 1997) (internal quotation marks omitted) ("[P]ersonality conflicts and questioning of job performance are unavoidable aspects of employment.").

Simply stated, a plaintiff does not raise an inference of discrimination merely by challenging the wisdom of the employer's business decision to discharge her. *See Jiminez v. Mary Washington Coll.,* 57 F.3d 369, 377 (4th Cir. 1995) (holding that Title VII "is not a vehicle for substituting the judgment of a court for that of the employer."); *Mayer v. Nextel W. Corp.,* 318 F.3d 803, 810 (8th Cir. 2003) ("We refuse to sit as a super-personnel department who second-guesses [the employer's] business decisions."); *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1063 (9th Cir. 2002) (holding that courts require an honest belief for the employer's proffered reason, even if that reason is foolish, trivial, or baseless); *Gordon v. United Airlines, Inc.,* 246 F.3d 878, 888-89 (7th Cir. 2001) (holding that plaintiff must establish more than that employer's decision was doubtful or mistaken because Title VII applies to discriminatory decisions not just inept or incompetent ones); *Billups v. Methodist Hosp.,* 922 F.2d 1300, 1304 (7th Cir. 1991) (refusing to second-guess employer's business decision to terminate plaintiff immediately, instead of suspending her pending further investigation of allegations that she physically abused patient).

Even if Dr. Bonds (1) had not actually violated the confidentiality policy (which she concedes she did) or (2) was not the one responsible for the missing expiration dates on the labels that led to the clinical hold or (3) had not had  such strained working relationships with her colleagues and subordinates that it affected the studies that she oversaw, all of which the Court must accept for purposes of this motion, Dr. Bonds has come forward with no evidence to show that the decisionmakers did not believe that these facts were true.  In short, based upon the evidence in the

record, the Court finds that no reasonable juror could conclude that Defendants' proffered explanations were unworthy of credence. Beyond that, Dr. Bonds has failed to show that discrimination was the real reason behind NHLBI's decision.

At most, therefore, Dr. Bonds can demonstrate only that Defendants may have been wrong about one reason (the expiration dates). As for the other nondiscriminatory reasons (the confidential information and her strained working relationships), Dr. Bonds has not shown pretext. In these circumstances, there is insufficient probative evidence of pretext to permit a court to send this case to the jury under *Reeves*. While "it is *permissible* for the trier of fact to infer the ultimate fact of [retaliation or discrimination] from the falsity of the employer's explanation," *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000), it is axiomatic that the plaintiff must in fact provide sufficient evidence from which a reasonable trier of fact could find falsity" and Dr. Bonds has not borne her burden of coming forward with that sort of evidence. *Price v. Thompson,* 380 F.3d 209, 218 (4th Cir. 2004).

The Supreme Court has "reiterated that trial courts "should not treat discrimination differently from other ultimate questions of fact" as there will be instances in which the "employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves*, 530 U.S. at 148. Applying this standard, the discrimination claims of Dr. Bonds must, for the reasons discussed above, fail.

### 2.    Retaliation

In addition to prohibiting discriminatory practices, Title VII prohibits retaliation against an

employee for engaging in activity protected by Title VII, such as filing a complaint of discrimination.

Dr. Bonds first contends that Title VII offers greater protection to federal employees by prohibiting a broader array of activity than Title VII does when applied to private employees. *Compare* 42 U.S.C. § 2000e-16(a) ("All personnel action affecting [federal government] employees . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin") *with* 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice . . . or participated in any manner in an investigation, proceeding, or hearing under this subchapter").

Despite the contention of Dr. Bonds that a broader range of activity is actionable in cases involving federal employees, the Fourth Circuit has explicitly and repeatedly rejected the invitation to create a distinction between what constitutes actionable activity in private-sector versus federal-sector retaliation cases and has thus used the standard applicable in § 2000e-3(a) claims.  *See Caldwell v. Johnson*, 289 Fed. Appx. 579, 590 (4th Cir. 2008) ("Our cases have supported the proposition that the anti-retaliation standard that applies to private employees also applies to federal employees); *Bhella v. England*, 91 Fed. Appx. 835, 844-45 (4th Cir. 2004) (holding that despite the textual differences between the private-sector and federal-sector provisions, they "generally have been treated as comparable, with the standards governing private-sector claims applied to [federal-sector claims.]"); *accord Avon v. Sampson*, 547 F.2d 446, 449-50 (9th Cir. 1976) (holding that section 2000e-16 incorporates section 2000e-3(a).   The Fourth Circuit has held that the standard for retaliation claims announced in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68,

(2006) "applies to federal employees and private employees alike" whose retaliation claims arise under § 2000e-16(a); thus a federal-sector retaliation claim is co-terminous with a private-sector retaliation claim. *Caldwell*, 289 Fed. Appx. at 588, 598. Accordingly, the Court will decline the invitation of Dr. Bonds to apply greater protections and will apply the binding precedents cited above.

To establish a prima facie case of retaliation, a plaintiff must establish that (1) she engaged in protected activity, (2) her employer took an adverse action against her, (3) and a causal relationship existed between her protected activity and the employer's adverse action. *See Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004). If the employer proffers a nonretaliatory reason for its actions, the employee must then show that the employer's proffered reasons are pretextual. *Id.*

That the Court has rejected the discrimination claims of Dr. Bonds does not affect her ability to establish a retaliation claim, provided that she reasonably believed that she was the subject of prohibited discrimination. *See Ross v. Communications Satellite Corp.,* 759 F.2d 355, 357 n.1 (4th Cir. 1985) ("An underlying discrimination charge need not be meritorious for a plaintiff to prevail on a claim of retaliation for opposition to the perceived discrimination."), *overruled in part on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228, 238 n.2 (1989).

### i)      Protected Activity

Dr. Bonds contends that she engaged in protected activity when she advocated for the rights of the study participants regarding Dr. Ware's use of their genetic material to create immortalized cell lines without their consent. Though her actions may have been admirable, they do not fall within the ambit of what Title VII considers to be protected activity; therefore, she has failed to satisfy this element of a prima facie case.

Title VII's protections are more circumscribed than Dr. Bonds contends. Title VII proscribes retaliation against persons complaining of unlawful discrimination due to their opposition to an unlawful employment practice or participation in proceedings in an employment action involving the employer. *Childress v. City of Richmond*, 120 F.3d 476, 481 (4th Cir. 1997). Dr. Bonds bases one ground of her retaliation claim on her attempt to prevent the creation of immortalized cell lines, which she claims violated the rights of minorities involved in the BABY HUG study. But, as provided for by statute and in this Circuit's decisional law, Title VII protects opposition to only "practice[s] that Title VII forbids." *White*, 548 U.S. at 59 (quoting § 2000e-3(a)). The efforts of Dr. Bonds " to safeguard the rights of vulnerable minorities during scientific studies," does not constitute "protected activity" because the creation of immortalized cell lines is not an illegal *employment* practice. Thus, it is not "a practice that Title VII forbids." *Crowley v. Prince George's County, Md.*, 890 F.2d 683, 687 (4th Cir. 1989); *see also Jamil v. Secretary, Dept. of Defense*, 910 F.2d 1203, 1207 (4th Cir. 1990) ("Title VII is not a general "bad acts" statute; it only addresses discrimination on the basis of race, sex, religion, and national origin, not discrimination for whistleblowing"). Apart from her bare assertions that "[a]s the federal medical officer overseeing BABY HUG, [her] duties included ensuring that the participants were not subjected to discriminatory treatment and the trial was conducted lawfully and ethically," Pl.'s Opp. to Def.'s Mot. Summ. J. 39, Dr. Bonds has once again failed to adduce any *factual* support for that contention, which is insufficient to carry her burden on summary judgment that she opposed *employment-related*

*practices* as required under Title VII.[8]

Dr. Bonds alleges that she was retaliated against for her involvement in the investigation of the immortalized cell lines that involved primarily African-American study participants. She contends that this states a claim for discriminatory retaliation in violation 42 U.S.C. § 2000e-3. However, section 2000e-3 forbids discrimination against an employee "because he has opposed any practice *made an unlawful employment practice* by this subchapter, or because he has . . . participated in any manner in an investigation, proceeding, or hearing under this subchapter." (emphasis added).

In *Crowley v. Prince George's County, Maryland*, 890 F.2d 683, 687 (4th Cir. 1989), *rehr'g and rehr'g en banc denied*, the plaintiff alleged that he had been retaliated against (in the form of a downgraded position) due to his involvement in the investigation of racial harassment claims against the police department, his employer. The Fourth Circuit held that plaintiff's retaliation claim on this basis was not supported under Title VII because it did not concern discriminatory *employment practices*, but rather discriminatory practices in general and that Title VII was not intended to be read that broadly. *Id.*

Like the plaintiff in *Crowley,* Dr. Bonds "complains not that she has been retaliated against for investigating discriminatory *employment* practices within [her place of employment], but for

---

[8]Dr. Bonds also contends that "[a]s an African-American woman, and as a Sickle Cell researcher familiar with the history of medical mistreatment of minorities, [she] was well aware of our nation's sad history of abusing racial minorities in medical experimentation," including her own father's history as such a victim, and that Dr. Ware's creation of immortalized cell lines was "deeply connected to [her] own race." Pl.'s Opp. to Def.'s Mot. Summ. J. 40. Undoubtedly, Dr. Bonds was discomfited and disillusioned about her discovery of the immortalized cell lines, but a Title VII, "protected activity" must be employment-related, and the participants in the study were not employees. *See Crowley*, 890 F.2d at 687.

investigating instances of [race-based discrimination] perpetrated by [her co-workers] against members of the community." *Id.* In that case – and in this one – it is without a doubt that "[s]uch a claim simply is not cognizable under Title VII" because Title VII only forbids "discrimination relat[ing] to a practice of *employment*." *Id.* (emphasis in original).

In so holding, the Fourth Circuit recognized that the "downgrading of Crowley's position by [her supervisor] was wrongful or even spiteful," but that "Title VII is not a general 'bad acts' statute." *Id.* (citation and internal quotations omitted). Similarly, to recognize the claim of Dr. Bonds "would be to authorize retaliation actions under Title VII for anyone whose job entails the investigation of any claim of discrimination against his or her employer, without regard to whether the claimed discrimination relates to a practice of employment. While Congress may decide to extend the statute's coverage to persons who bring any discriminatory practice of an employer to light, such a step lies beyond the province of the courts. To find in Title VII protection for whistle-blowers on each and every instance of discrimination on the part of an employer is more than [the Fourth Circuit] think[s] the plain language of its provisions will support." *Id.*

Like the investigation by the plaintiff in *Crowley*, the opposition of Dr. Bonds to allegedly illegal research methods has nothing to do with her employer's discriminatory *employment* practices. Therefore, her allegation that she was retaliated against for revealing improprieties in a medical study are irrelevant to and cannot be sustained as a ground for her Title VII retaliation claim. This finding is also supported by decisional law from other federal courts. *See, e.g. Evans v. Kansas City, Missouri Sch. Dist.,* 65 F.3d 98, 101 (8th Cir. 1995) (holding that school employee's opposition to his employer's neglect of the needs of the black students was not related to a practice of employment and thus not protected activity under Title VII); *Ramsey v. Centerpoint Energy/Entex*, No. Civ.A.

3:04CV769WHBAG, 2006 WL 149065, at * 3 (S.D. Miss. Jan. 19, 2006) (holding that utility employee's opposition to his employer's "discriminatory conduct against nonemployees [its customers] . . . are not actionable under Title VII"); *Cass v. Am. Props., Inc.*, 861 F. Supp. 55, 57-58 (N.D. Ill. 1994) (holding that plaintiff's termination for her opposition to her employer's discriminatory rental practices, though "laudable," was not protected activity because "Title VII does not protect all forms of opposition to all forms of discrimination,"though her opposition was "laudable," plaintiff's "own allegations indicate that no employment practice is involved."); *Needy v. City of Broken Arrow, Oklahoma,* No. 07-CV-0018-C.E.-F.M., 2007 WL 1574762, at *3 (N.D. Okla. May 29, 2007) (holding that "[N]o the extent that the conduct of the firefighters affected only members of the public (i.e. non-employees of the defendant), plaintiff cannot state a claim of retaliation under Title VII.").

Because advocating for the rights of minority study participants and opposing practices unrelated to employment are not considered protected activity under Title VII, Dr. Bonds has failed to prove a necessary element of her prima facie on this ground. Indeed, the Fourth Circuit has repeatedly cautioned that Title VII is not a general "bad acts" statute. *Crowley*, 890 F.2d at 687.

Accordingly, her advocacy for the rights of study participants who were not employed by Defendants is not an employment-related practice for purposes of Title VII and thus is not "protected activity."[9]

It is undisputed that the other conduct Dr. Bonds alleges to participated in – filing EEO complaints in 1999 and 2003 against Dr. Peterson, participating in the EEO proceedings initiated by Herman Branson, filing EEO complaints against Drs. Moore and Dr. Peterson in 2005 challenging her removal as the SWiTCH PO and filing her complaint with the OSC in 2005 – qualify as protected activity. *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004) (holding that prior EEO complaint constitutes protected activity); *Kubicko v. Ogden Logistics Servs.,* 181 F.3d 544, 551 (4th Cir. 1999) (holding that participation in any manner in a Title VII investigation, proceeding, or hearing is protected activity).

### ii)    Causation

While Dr. Bonds meets the protected activity element by virtue of her participation in EEO proceedings or opposition to unlawful discriminatory employment practices, she is nevertheless

---

[9]The primary ground relied upon by Dr. Bonds for arguing that *Crowley* is distinguishable rests upon her erroneous contention that a broader array of activity is action under Title VII for public-sector employees as opposed to the standard applied to private-sector employees. As discussed in greater detail *supra*, the Fourth Circuit has declined to adopt such a distinction. Accordingly, *Crowley* speaks to the issue directly and supports the Court's conclusion that Title VII requires that the retaliation relate to the participation of Dr. Bonds in or opposition to her employer's *employment-related* practices. *Crowley*, 890 F.2d at 687.

Her reliance on a Ninth Circuit case is also inapposite. In *Wrighten v. Metropolitan Hosps., Inc.,* 726 F.2d 1346 (9th Cir. 1984), the nurse-plaintiff there had a tort duty to her patients while, based upon the facts adduced in the record before the Court, the study administrator-plaintiff here does not appear to owe such a tort duty to the study participants. In any event, the Court is not bound by *Wrighten* which is factually distinguishable and from a sister circuit. This Court's decision is compelled by the Fourth Circuit's binding decision on point in *Crowley*.

unable to establish a prima facie case of retaliation because she has failed to satisfy the required element of causation.

Dr. Bonds alleges that she engaged in the following protected activity: (1) filing EEO complaints in 1999 and 2003 against Dr. Peterson; (2) participating in the EEO proceedings initiated by Herman Branson; (3) filing EEO complaints against Drs. Moore and Dr. Peterson in 2005 challenging her removal as the SWiTCH PO; and (4) filing her complaint with the OSC in 2005.

As a threshold matter, the Court notes – and the parties do not dispute – that there is no direct evidence of a retaliatory intent by either Drs. Moore or Dr. Peterson, the individuals responsible for removing Dr. Bonds as the SWiTCH PO and for her ultimate removal from federal service.  The affidavits submitted by Dr. Bonds do not set forth direct evidence of such an animus, and the additional discovery ordered under Federal Rule of Civil Procedure 56(f) by this Court has not adduced any direct evidence either.

As a result, in the absence of direct evidence of retaliatory evidence, Dr. Bonds must rely upon the inference that may arise from temporal proximity between the protected activity of which Drs. Moore and Peterson were aware and the alleged adverse employment actions she suffered in retaliation.  The required temporal nexus is a close one; the Fourth Circuit has held that "[a] lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action . . . negates any inference that a causal connection exists between the two." *Dowe v. Total Action Against Poverty in Roanoke Valley*,145 F.3d 653, 657 (4th Cir. 1998).  The Fourth Circuit has held that a three-month nexus is sufficient to establish an inference of causal connection, *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989), but observed that a four-month lag is insufficient. *See Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998) (citing with

approval *Conner v. Schnuck Markets, Inc.,* 121 F.3d 1390, 1395 (10th Cir. 1997) (holding that four-month nexus was too weak to justify inference of causation)).

Here, the multiple *year* time-lag between the 1999 and 2003 EEO complaints by Dr. Bonds as well as her participation in Dr. Branson's EEO proceeding and her 2005 removals as project officer from the SWiTCH and BABY HUG trials as well as her 2006 removal from federal service cannot support an inference of causation because they vastly exceed the three-month benchmark and thus are far too attenuated. *See Dowe*, 145 F.3d at 657, *Causey,* 162 F.3d at 803.

While the 2005 EEO complaints of Dr. Bonds (which challenged her removal as the PO for the SWiTCH and BABY HUG trials) and OSC complaint in 2006 fall within a temporal nexus that would tend to support an inference of causation, ultimately Dr. Bonds cannot demonstrate that an inference of causation is appropriate or supported by the evidence because she has failed to demonstrate that the relevant decisionmakers had knowledge of those instances of protected activity.

Knowledge by the employer of a plaintiff's protected activity is "absolutely necessary" to establish causation in a retaliation case. *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998); *see also Causey v. Balog,* 162 F.3d 795, 803-04 (4th Cir. 1998) (holding that plaintiff had not stated a prima facie case for retaliation because plaintiff did not present any evidence that his employer was involved in the investigation). But, though necessary, knowledge alone is not sufficient to establish a causal connection between [plaintiff's] protected activity and [the employer's] [alleged adverse employment] decision." *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004); *see also Hooven-Lewis v. Caldera*, 249 F.3d 259, 273 (4th Cir. 2001) (holding that plaintiff's "informal contacts with the EEO and informal complaints [would be considered] protected activities *if* the accused person or entity knew about them") (emphasis

added)).

Simply put, there is no legally sufficient evidence in the summary judgment record before the Court to establish that either Dr. Moore or Dr. Peterson was aware of protected activity by Dr. Bonds, namely her EEO complaints and OSC complaint.  It is noteworthy and significant that even with court-ordered Rule 56(f) discovery that Dr. Bonds was unable to cure this deficiency in her prima facie case.[10]   That additional discovery permitted Dr. Bonds to depose eleven former

---

[10]Dr. Bonds filed a second Rule 56(f) affidavit, in which she seeks to conduct three additional depositions, to continue several depositions that she claims Defendants cut short, and to obtain certain documents that Defendants allegedly have either refused or failed to provide to her.

First, counsel for Dr. Bonds contends that depositions of NHLBI Executive Officer Don Christoferson, DBDR Administrative Officer Kathy Lightbody, and NHLBI Employee Relations Officer Kathy Defibaugh are "critical to understand[ing] the breadth and scope of the search of [his client's] privileged communications, the bases for conducting the search, to establish knowledge of [Dr. Bonds's] protected activity and discriminatory motive." Kohn Summ. J. Aff. ¶ 3.  He contends that these depositions are necessary to demonstrate the improper motive for his client's removal and the impropriety of the investigation.  *Id.*  Christoferson is alleged to be the "central figure behind the decision to investigate [Dr. Bonds] and controlled the hiring and investigative efforts of Mr. William Rudman and approved the search of [his client's] computer."  *Id.* ¶¶ 6-8.  Lightbody is alleged to have taken part in the administrative inquiry against Dr. Bonds even though it did not comply with NIH policy, and she is alleged to have been involved in the removal of Dr. Bonds and the search of her computer.  *Id.* ¶¶ 9-10, 13-14.  Defibaugh is alleged to have assisted in the investigation and involved in the removal of Dr. Bonds.  *Id.* ¶ 3.  The Court finds that these individuals have a much more attenuated connection to the main actors involved with the investigation of and removal of Dr. Bonds (namely, Dr. Moore, Dr. Peterson, and Dr. Nabel), actors who Dr. Bonds has already deposed. Again, based upon the merits analysis above of her claim, even if Dr. Bonds is able to demonstrate that a mistake was made as to the search of her computer or the mislabeling of the expiration dates, as a legal matter that does not constitute pretext.

Second, Dr. Bonds also contends that Defendants truncated the depositions of key witnesses in contravention of the maximum time allotted for these depositions by the Court's Order.  Her counsel seeks an additional four hours to depose Dr. Peterson, whose deposition allegedly was cut short by one hour due to a scheduling conflict, because "a review of the prior deposition indicates that the deposition ended before the witness could address the events surrounding [the termination of Dr. Bonds]."  *Id.* ¶ 16.  Her counsel seeks an additional four hours to depose Dr. Moore, who was deposed for the allotted four hours, because Dr. Moore's responses were alleged to be neither forthright nor forthcoming and her counsel allegedly ran out of time before questioning Dr. Moore

colleagues who were alleged to have knowledge about the role (or lack thereof) of Dr. Bonds in the removal of the expiration dates, her removals as project officers, and her ultimate removal from federal service. Also telling is the fact that during Drs. Moore and Peterson's depositions, her counsel did not even question them regarding their knowledge, if any, of her EEO and OSC complaints. Dr. Bonds has not pointed to any evidence that Dr. Peterson, who was the official at NHLBI who approved the proposal to remove her from federal service knew, prior to granting his approval, that she had filed her EEO complaint and OSC complaint. Therefore, Dr. Bonds cannot establish retaliatory motive with respect to those events and thus her retaliation claim lacks merit. *See Baqir v. Principi*, 434 F.3d 733, 748 (4th Cir. 2006) (holding that plaintiff's failure to demonstrate that officials were aware of his contact with the EEO counselor or his filing of administrative complaint at the time the alleged retaliation occurred was fatal to a finding of a prima

---

on "critical" issues including his memorandum proposing the removal of Dr. Bonds. *Id.* ¶¶ 17-18. The Court finds that additional time for depositions of these witnesses is unwarranted because counsel had ample time to address critical issues surrounding the termination of Dr. Bonds and counsel has not demonstrated that Dr. Moore's responses were anything more than "forgetful," rather than not "forthright or forthcoming" as opposed to merely forgetful.

Third, Dr. Bonds finally contends that Defendants have refused or otherwise failed to provide certain documents, which she believes are "critical" to her case. These documents include a full version of the OIG report, which ultimately concluded that the NIH officials participated in the violation of federal law, that contains the testimony of Dr. Nabel, Dr. Moore, and Dr. Peterson about their involvement with the immortalized cell lines. The OIG report is purported to be relevant to rebut Defendants' claim that they lacked knowledge of the activity of Dr. Bonds. *Id.* ¶ 19. Her counsel also seeks the interview notes made by Rudman (who is now deceased), which are the sole documentation of the substance of the interviews he conducted and serve to support her assertion that the investigation against her was improper. *Id.* ¶ 20. The Court finds that Dr. Bonds and her counsel have not demonstrated the necessity of these documents. Her counsel had already deposed eleven of her former colleagues – including Dr. Moore and Dr. Peterson, whom her counsel neglected to even question about their knowledge of her alleged protected activity. Counsel's failure to ask the necessary and critical questions at the proper juncture is an insufficient basis for the Court to grant a *second* Rule 56(f) request for additional discovery requested at the eleventh hour.

facie case).

Similarly, Dr. Bonds has also failed to adduce any evidence that Drs. Moore or Peterson were even aware of her 2005 activity as a witness for Dr. Branson's EEO complaint.

Finally, the last asserted ground – that she was retaliated against by her October and November 2005 removals as the project officers for the SWiTCH and BABY HUG trials for her December 2005 EEO complaint, which she informed Dr. Peterson she was filing in October 2005 – tests commonsense. The alleged retaliatory acts had already occurred *before* her December 2005 EEO complaint. But, in any event, Dr. Bonds failed to exhaust her administrative remedies with regards to the October and November 2005 removals because she did not include them in her December 2005 complaint.

Dr. Bonds presents no facts that tend to show this treatment was due to her age, race, sex, and physical disability rather than Defendants' admittedly longstanding belief that Dr. Bonds was responsible for removing the expiration dates on the drug that led to the clinical hold on the BABY HUG trial, disclosing confidential information, and impairing the administration of clinical trials due to her personality conflicts with colleagues and subordinates. Rather, the factual record before the Court demonstrates that each action that led to her removal was based entirely on the several allegations of her serious misconduct that compromised the integrity of a study's financing, negotiations, and, most importantly, the health and safety of its participants. No reference was made to her prior EEO activity whatsoever. Accordingly, Dr. Bonds has failed to show that her prior EEO activity and her removals were causally connected, and thus has not made out a prima facie case of retaliation.

Dr. Bonds has demonstrated that she and NHLBI did not see eye-to-eye. But this showing

of a difference of opinion, coupled with her conclusory allegations of racism, cannot reasonably support the conclusion that her discharge was motivated by an improper animus.  *See Hawkins v. Pepsico, Inc.,* 203 F.3d 274, 281 (4th Cir. 2000) (holding that plaintiff's mere disagreement with her employer's dissatisfaction with her performance was insufficient to demonstrate that the employer's reason for terminating her was pretextual).  Certainly, the Court recognizes that there may have been ill will between Dr. Bonds and Drs. Moore and Peterson prior to Dr. Moore recommending her removal and Dr. Peterson ultimately approving it, but "ill will is not itself an indication of discriminatory pretext."  *Rupert v. Geren*, No. CCV-08-1518, at 13 n.12 (D. Md. Mar. 31, 2009) (Blake, J.) (citing *Hooven-Lewis*, 249 F.3d at 274 ("Personality conflicts are not actionable as retaliation.")).

Even if a prima facie case were to be assumed, the Defendants have articulated legitimate, nondiscriminatory reasons for the removal of Dr. Bonds that she has failed to demonstrate are pretextual.  As reflected in Dr. Peterson's removal notice, Dr. Bonds was found to have engaged in two serious instances of "gross negligence" stemming from her disclosure of confidential information and her role in the removing the expiration dates leading to the full clinical hold and that any *one* instance of "gross negligence" warranted removal under the NIH Table of Penalties.  *See* (Def.'s Ex. 23 at 5-6).  Even if the removal of the expiration dates was a misunderstanding, as Dr. Bonds contends, she has failed to demonstrate that it was not a true basis for her removal.

Therefore, for all of the reasons stated above, summary judgment is warranted as to the claim of retaliation by Dr. Bonds.

## C.     COUNT FOUR - WHISTLEBLOWER PROTECTION ACT

Dr. Bonds also contends that NHLBI officials took personnel actions against her prohibited

by the Whistleblower Protection Act due to her protected disclosures within the NHLBI as well as to the OSC.  For the reasons discussed in greater detail below, these claims are also without merit and cannot survive summary judgment.

      1.        **Subsection (A) Claim - "Protected Disclosure"**

Dr. Bonds contends that she was retaliated against for "rais[ing] concerns to her supervisors that it was unethical and a violation of law to obtain genetic material from BABY HUG subjects without the consent of the parents."  Compl. ¶ 90.

The Whistleblower Protection Act ("WPA")  makes it a prohibited personnel action to take or fail to take a personnel action because of "*any* disclosure of information by an employee . . . which the employee . . . reasonably believes evidences (i) a violation of any law, rule, or regulation, or (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety." 5 U.S.C. § 2302(b)(8)(A) (emphasis added).  The Fourth Circuit has read in an "additional element" that must be proven: "that the disclosure evidences an intent to raise an issue with a higher authority who is in a position to correct the alleged wrongdoing." *Hooven-Lewis v. Caldera*, 249 F.3d 259, 276 (4th Cir. 2001).  Accordingly, disclosures made directly to the "wrongdoer" do not qualify as "protected disclosures" because they do "not evidence an intent to disclose" wrongdoing to a "higher authority." *Id.*; *see also Huffman v. Office of Personnel Mgmt.,* 263 F.3d 1341, 1350 (Fed. Cir. 2001) ("[w]hen an employee reports or states that there has been misconduct by a wrongdoer to the wrongdoer, the employee is not making a 'disclosure' of misconduct" because "[t]he purpose of the [WPA] is to encourage disclosures that are likely to remedy the wrong" and "[t]he wrongdoer is not such a person.").

As a threshold matter, federal courts interpreting Subsection (A) claims under the WPA have uniformly held that an employee who makes disclosures as part of his or her normal duties cannot claim the protection of the WPA because "[t]he WPA was established to protect employees who go above and beyond the call of duty and report infractions of law that are hidden." *See, e.g., Huffman v. Office of Personnel Mgmt.,* 263 F.3d 1341, 1353 (Fed. Cir. 2001).

Moreover, a plaintiff's dissatisfaction with a supervisor's decisions when voiced to the supervisor are not protected disclosures under the WPA because "[d]iscussion and even disagreement with supervisors over job-related duties is a normal part of most occupations.  It is entirely ordinary for an employee to fairly and reasonably disagree with a supervisor who overturns the employee's decision.  In complaining to his supervisors, [plaintiff] has done no more than voice his dissatisfaction with his superiors' decision," which are not protected disclosures for the purposes of the WPA.  *Willis v. Dep't of Agriculture*, 141 F.3d 1139, 1143 (Fed. Cir. 1998) (holding that plaintiff's reassignment after sending letter to his supervisor criticizing supervisor's decision was not cognizable claim under WPA).

Accordingly, the emails and other communication sent by Dr. Bonds to Drs. Moore, Peterson, and Nabel at NHLBI regarding Dr. Ware's immortalized cell lines cannot be considered "protected disclosures" under Subsection (A) because they were made in the ordinary course of her job as project officer of the BABY HUG trial, a position that required her to oversee the day-to-day operations, supervise lead investigators including Dr. Ware, and bring any issues regarding the trial to senior NHLBI officials, *and* the disclosures were made to the supervisors with whom she disagreed.  *See*  (Def.'s Ex. 32, 33).  Thus, disclosures about the actions of one's *subordinates* to

one's superiors is not a protected disclosure[11]; indeed, that was her job.  Dr. Bonds herself even acknowledged that she made disclosures regarding Dr. Ware's immortalized cell lines and advocated for the destruction of those cell lines because she believed she was required to do so "in [her] role as the BABY HUG project officer."  (Def.'s Ex. 35; *see also* Def.'s Ex. 32 & 33).

Though Dr. Bonds spills much ink on the contention that by bringing her concerns to Dr. Nabel, she was making a disclosure "outside of normal channels" (thus making it a protected disclosure under *Huffman*), the facts in the record demonstrate that Dr. Nabel was within the direct line of supervision – Dr. Bonds reported to Dr. Moore, who was one of two section chiefs reporting to Dr. Peterson, who then reported to NHLBI Director Dr. Nabel.  (Def.'s Ex. 1; Pl.'s Ex. 1 ¶ 21).  Just because the hierarchy at NHLBI contemplated that an employee in her position would "work through their supervisor" first does not mean that  that was the *only* avenue an employee was free to take; there is a distinction between what a first step *should* be and what other measures an employee *could* take, including bringing the concern up the chain of command.  *See* (Pl.'s Ex. 37 7-8, 60-61).

Similarly, Dr. Moore's disappointment with Dr. Bonds for contacting Dr. Nabel and his view that it was "inappropriate" proves nothing more than that Dr. Moore was upset about being brought to task before his ultimate supervisor.  More importantly, the fact that Dr. Moore thought that Dr. Bonds should have approached Dr. Peterson, who then should have raised the issue to Dr. Nabel, demonstrates only that Dr. Bonds *could* have gone directly to Dr. Nabel but that Dr. Moore found it more "professional" to go through Dr. Peterson first.  *See* (Pl.'s Ex. 110, 142-43, 167-68).

---

[11]*Cf. Hooven-Lewis*, 249 F.3d at 277 (holding that it was a protected disclosure for employee to approach second-line supervisor about first-line supervisor's alleged falsification of research results).

Because Dr. Bonds voiced her complaints repeatedly to Drs. Moore, Peterson, and Nabel about the creation of the immortalized cell lines as part of her ordinary job duties and subsequently voiced her disagreement with their decisions on how to handle the immortalized cell lines, her disclosures are not considered "protected disclosures" under the WPA. *Huffman,* 263 F.3d at 1350, 1353; *Willis*, 141 F.3d at 1143. This is because "[i]f every complaint made to a supervisor concerning an employee's disagreement with the supervisor's actions were considered to be a disclosure protected under the WPA, virtually every employee who was disciplined could claim the protection of the Act. Although Congress intended that the WPA's coverage be broad, we think it unlikely that Congress intended the Act to extend that far, and we hold that it did not." *Huffman*, 263 F.3d at 1350. Dr. Bonds has failed to adduce any evidence to rebut the evidence presented to the Court that demonstrates that her disclosures were part of her regular job duties as PO for the BABY HUG trial and her other disclosures were mere disagreement with her supervisors' decisions on how to handle the situation – a situation in which they were not the ultimate decisionmakers capable of effectuating the result she sought.

Though Dr. Bonds contends that it is "obvious" that Dr. Nabel, in her capacity as the Director of NHLBI, qualified as a person with "higher authority who is in a position to correct the alleged wrongdoing," *Hooven-Lewis*, 249 F.3d at 276, this contention is not borne out by the facts in the record before the Court. Apart from the conclusory and factually unsupported contention by Dr. Bonds that "Dr. Nabel had the authority to obtain the immediate destruction [of the immortalized cell lines]," Pl.'s Opp. to Def.'s Renewed Mot. Summ. J. 28, Dr. Bonds has not adduced a single fact

in the record that supports this finding.[12]  To the contrary, the record is replete with facts that support the finding that it was the Internal Review Boards at each of the research hospitals and study centers that were the ultimate decisionmakers capable of "correcting the alleged wrongdoing," *i.e.* making the decision to destroy the immortalized cell lines.  The genetic material that formed the basis for the immortalized cell lines belonged to the study participants, who alone had the right to decide whether the immortalized cell lines should be destroyed or preserved.  *See, e.g.* (Pl.'s Ex. 4 at 5-7, 12-16; Pl.'s Ex. 110 at 96-143).

Officials at the NHLBI took varied stances on this issue at varying points, including Dr. Nabel, who initially agreed with Dr. Bonds, but later determined that the NHLBI lacked the authority to order the destruction of the cell lines.  (Pl.'s Ex. 4 at 8; Pl.'s Ex. 37 at 29-31, 33-34). This was because BABY HUG was a study that was conducted nationwide at multiple research hospitals and study centers, each of which had its own Institutional Review Board ("IRB") that was responsible for the oversight of human research studies at that location.  (Pl.'s Ex. 4 at 15-16).  The IRBs had jurisdiction over the activities at their respective research hospitals and medical centers and, notably, the IRBs disagreed among themselves as to what the appropriate course of action was regarding the unconsented-to use of genetic material that resulted in immortalized cell lines.  *Id.* Some IRBs decided to procure new consent forms from the study participants that permitted the use of their genetic material for immortalized cell lines so that those cell lines did not have to be destroyed, while other IRBs interpreted their existing consent forms as sufficient for the consent to

---

[12]Though Dr. Bonds characterizes the NHLBI's response as immediate, negative, and unwielding, the facts in the record demonstrate otherwise, namely, that there was spirited debate about the appropriate course of action to take regarding the immortalized cell lines within the NHLBI from September to November.  *See, e.g.,* (Pl.'s Exs. 44 & 45).

create immortalized cell lines.  (Pl.'s Ex. 4 at 14-15).

Simply put, as a matter of law, Dr. Bonds has failed to demonstrate that she engaged in the requisite "protected activity" under Subsection (A) because she did not report the issue to an authority in a position to remedy the alleged wrong and she did not go outside normal channels and beyond her typical job duties in doing so.  (Pl.'s Ex. 14 at 14-15); *Huffman*, 263 F.3d at 1351-52.

### 2.      Subsection (B) Claim - "Protected Disclosure" to the OSC or the OIG

Dr. Bonds also contends that she was retaliated against in violation of Subsection (B) of the WPA as a result of her disclosure to the OSC.  The WPA provides that a supervisor may not take or fail to take a personnel action against an employee because that employee made a protected disclosure to the Office of Special Counsel or the Inspector General.  5 U.S.C. § 2302(b)(8)(B).

Dr. Bonds alleges in her complaint that she first approached the OSC on December 28, 2005, to disclose information about Dr. Ware's creation of the immortalized cell lines.  Compl. ¶ 52. However, it would defy the statutory text and common sense to find that her removals as PO on the SWiTCH and BABY HUG trials were causally related to her OSC visit because her visit to the OSC occurred in December 2005, but the two allegedly retaliatory acts – her removal as PO for the SWiTCH trial and the BABY HUG trial – occurred one to months *prior to* her OSC visit.  *See Hooven-Lewis v. Caldera*, 249 F.3d 259, 275 (4th Cir. 2001) (holding, in a Title VII retaliation case, that a decision made several days *prior to* the alleged protected activity was not causally related). Thus, there can be no causal nexus for retaliatory activity that is alleged to have taken place months prior to the protected activity – to hold otherwise would contradict the very essence of retaliatory action.

In terms of her removal from federal service on October 18, 2006, the chief evidentiary

defect is that Dr. Bonds has adduced no evidence that Dr. Peterson, the official responsible for issuing the memorandum that removed her from federal service, was even aware of her contact with the OSC.  As discussed earlier, knowledge by the employer of the plaintiff's protected activity is "absolutely necessary" to establish causation in a retaliation case.  *Dowe*, 145 F.3d at 657; *see also Causey,* 162 F.3d at 803-04 (holding that plaintiff had not stated a prima facie case for retaliation because plaintiff did not present any evidence that his employer was involved in the investigation).  Similar to her Title VII claim, Dr. Bonds has adduced no evidence that Dr. Peterson was aware of her protected disclosure to the OSC.

The challenge by Dr. Bonds rests upon her assertion that because Drs. Nabel, Peterson, and Moore were subjected to questioning by the HHS-OIG during the course of its investigation, *a fortiori* those individuals "all knew that OIG was investigating [her] disclosure."  *See* Pl.'s Opp. to Def.'s Renewed Mot. Dismiss or Summ. J. 27.  It is undisputed that Drs. Nabel, Peterson, and Moore were interviewed as part of the OSC investigation, which culminated prior to the report's release on June 13, 2006.  (Pl.'s Ex. 4 at A-1 to A-15).  But the mere fact that Dr. Peterson was interviewed by an agent of the OIG does not automatically serve to impute knowledge as to who was the catalyst for the OIG's investigation – there is no evidence that Dr. Peterson was ever informed whether the OSC investigation was initiated by the OSC or by Dr. Bonds or by another individual.  Based upon the facts in the record before the Court, all that Drs. Nabel and Peterson knew was that the OIG was investigating the circumstances surrounding Dr. Ware's creation of immortalized cell lines.  Absent evidence that the OIG revealed to Drs. Nabel and Peterson the existence of the complaint by Dr. Bonds, the mere fact that they were interviewed by an OIG agent is insufficient to impute knowledge to them of her protected disclosure.

In light of the lack of *any* evidence that Drs. Nabel, Peterson, and Moore actually *knew* that the OIG's investigation was predicated upon the disclosure by Dr. Bonds – as opposed to a disclosure by another individual or the mere fact that the OIG report was issued four months prior to the removal of Dr. Bonds from federal service – the Court cannot accept speculation and conjecture in lieu of fact when evaluating this motion for summary judgment.  Dr. Bonds has failed to meet her burden here.

Dr. Bonds also attempts to impute knowledge of her OSC disclosure to Defendants by contending that the investigation of her work computer (which contained emails about her communications with the OSC in addition to a copy of the document she filed with the OSC) gave them actual knowledge of her disclosures to the OSC.  Again, it is undisputed that her emails were searched as part of the investigation into the complaints against her by her colleagues at NHLBI. *See* (Pl.'s Exs. 143 & 144).   Dr. Bonds also contends that because a copy of her OSC filing was stored on Dr. Moore's office computer, Dr. Moore necessarily knew about her OSC filing at time he recommended her removal from federal service.  *See* Pl.'s Opp. to Def.'s Mot. Summ. J. 35.  Dr. Bonds seizes upon this isolated fact as proof that Dr. Moore was aware of her communications with the OSC prior to her removal from federal service and that *a fortiori* Drs. Peterson and Nabel were aware of these communications as well.

Dr. Moore stated in his deposition that he became aware of the preparation of a complaint by Dr. Bonds  with the OSC on January 18, 2006.  (Pl.'s Ex. 110 at 188-89).  This alone does not suffice to carry her burden on summary judgment because of (1) the passage of nine months between Dr. Moore's knowledge of the OSC complaint and her removal from federal service; and (2) the absence of *any* evidence that Dr. Peterson, the official responsible for ultimately removing Dr.

Bonds from federal service, was aware of her OSC complaint.  Undoubtedly, Dr. Moore, who was her first-line supervisor and the individual who *recommended* her removal was aware of the OSC complaint, but Dr. Bonds has failed to adduce any evidence in the record that Dr. Peterson as the second-line supervisor who was responsible for reviewing, editing, and *approving* the proposal to remove her was aware of the complaint.  The factual record before the Court is devoid of any evidence that Dr. Moore shared the information about the OSC complaint by Dr. Bonds with Dr. Peterson or that Dr. Peterson was aware of it in any way.  Though Dr. Bonds contends that Dr. Peterson was aware of her visit because an agent of the Inspector General from the OSC interviewed him about Dr. Ware's conduct, Pl.'s Ex. 4 at A-7 to A-8, this does not establish that Dr. Peterson knew about the OSC Complaint or that it had been filed by Dr. Bonds.  There is no evidence that the agent of the Inspector General informed Dr. Peterson of the existence of a Complaint, much less the role of Dr. Bonds in filing it.

The contention by Dr. Bonds that Dr. Moore's awareness of the Complaint was sufficient to impute liability on Dr. Peterson under the WPA is also without merit.  In order for Dr. Moore's knowledge to be imputed to Dr. Peterson such that WPA liability may attach, Dr. Peterson's role must have been perfunctory, *i.e.* essentially a rubber stamp of Dr. Moore's recommendation.  *Hill v. Lockheed Martin Logistics Mgt. Inc.,* 354 F.3d 277, 287 (4th Cir. 2004) (holding that if the formal decisionmaker's role is perfunctory as a "cat's paw," the knowledge of the subordinate may be sufficient).  Here, the facts adduced in the record demonstrate that Dr. Peterson was anything but perfunctory in his review of Dr. Moore's proposal; though Dr. Peterson agreed with Dr. Moore's proposal to remove Dr. Bonds from federal service, he obtained an independent review from NHLBI administrator Wheeles, who had not been involved in the clinical trials, *and* declined to adopt

several aspects of Dr. Moore's proposal.  *See* Def.'s Ex. 25; *Compare* Def.'s Ex. 14 *with* Def.'s Ex.

23.  *See Belyakov v. Leavitt*, Nos. 07-2140 & 07-2141, 2009 WL 136918, at *5 (4th Cir. Jan. 21,

2009) (holding that discriminatory animus of supervisory official who had made statements could

not be imputed to final decisionmaker who conducted independent review).  Dr. Bonds has failed

to adduce any evidence to the contrary.  Therefore, the Court finds that summary judgment is

appropriate on the Whistleblower Protection Act claims.

### D.      COUNT FIVE - CIVIL SERVICE REFORM ACT

Finally, Dr. Bonds seeks reconsideration and reinstatement of this claim, which the Court

originally dismissed on August 19, 2008.  Dr. Bonds contends that she sufficiently pled her CSRA

claim within her EEO Complaint, that this Court has jurisdiction over the claim, and that this claim

should not be dismissed.

### 1.      Jurisdiction

The CSRA does not confer jurisdiction upon the federal district courts for a direct right of

action on an alleged violation of the CSRA.  Rather, the CSRA establishes a series of administrative

procedures which a federal employee must exhaust before bringing a complaint to a federal district

court.

Even if a Court finds that exhaustion has been met, it is unclear and unsettled whether this

Court may exercise jurisdiction over the non-discrimination aspects of a mixed-case[13] complaint.

The Fourth Circuit has not decided this issue, and there is a split of authority among other Circuits. Section 7701 of the CSRA provides that a federal employee may appeal to the MSPB from any action that is appealable under law, including the WPA, based upon the premise that a manager may not impose an overly harsh punishment for reasons unrelated to discrimination or retaliation. *See Afifi v. United States Dep't of the Interior*, 924 F.2d 61, 62 n.1 (4th Cir. 1991). Once the MSPB renders its final order or decision, the aggrieved employee may obtain judicial review, which entails a review of the record before the MSPB rather than *de novo* review. 5 U.S.C. § 7703(c).

In the event that an aggrieved employee alleges a non-discrimination claim (e.g., a claim under the WPA), which is subject to § 7701, § 7702 provides the employee with a choice of forum of either the MSPB or the Agency, in addition to a discrimination claim (e.g., under Title VII). 5 U.S.C. § 7702(a)(1)-(2). The MSPB's decision is then reviewable by the EEOC. 5 U.S.C. § 7702(b)-(d). If the MSPB or the Agency has not acted within 120 days or the EEOC has not acted within 180 days, the employee may sue in federal district court. 5 U.S.C. § 7702(e)(1). This provision permitting suit in a federal district court is unclear as to whether it includes both nondiscrimination claims and discrimination claims or only discrimination claims. The plain text of the statute appears to limit it to discrimination claims only: "the employee shall be entitled to file a civil action to the *same extent and in the same manner* as provided in section 717(c) of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-16(c)), section 15(c) of the Age Discrimination in Employment Act of 1967 (29 U.S.C. § 633a(c)), or section 16(b) of the Fair Labor Standards Act

---

[13]A mixed-case complaint is one that alleges age, race, sex, and disability discrimination, *inter alia*, related to or stemming from an action that is appealable to the MSPB. 29 C.F.R. § 1614.302(a)(1).

of 1938 (29 U.S.C. § 216(b)).”  5 U.S.C. § 7702(e)(1).  One federal district court has interpreted §

7702(e)(1) in this manner.  *See Vanover v. O'Leary*, 967 F. Supp. 1211, 1220-21 (N.D. Okla. 1997).

A complainant who files a mixed-case complaint with her agency's EEO Office can bring

the mixed-case complaint to the MSPB or to a federal district court, but not both, if 120 days elapse

without an agency decision.  29 C.F.R. § 1614.302(d)(1)(i).  If the complainant decides to file an

appeal with the MSPB in lieu of proceeding to a federal district court, the complainant “may raise

a claim or defense not included in the appeal at any time before the end of the conference(s) held

to define the issues in the case.  An appellant may not raise a new claim or defense after that time,

exept for good cause shown.  However, a claim or defense not included in the appeal may be

excluded if a party shows that including it would result in undue prejudice.”  5 C.F.R. § 1201.24(b).

This textual interpretation is contrary to the interpretation adopted by three sister circuits

who have reached the issue.  *Ikossi v. Dep't of the Navy,* 516 F.3d 1037 (D.C. Cir. 2008); *Seay v.

Tenn. Valley Auth.,* 339 F.3d 454 (6th Cir. 2003); *Doyal v. Marsh*, 777 F.2d 1526 (11th Cir. 1985).

*Ikossi* specifically held that § 7702(e)(1)'s references to Title VII, the ADEA, and the FLSA are not

limitations as to the subject matter that may be brought forward to district court on a mixed-case

complaint.  516 F.3d at 1041-42.  Despite the Fourth Circuit's silence on this issue, the Court finds

that only the discrimination claims are properly before it.  This is because CSRA claims brought

alone proceed to the MSPB for decision, and the MSPB decision (including the record before it) is

then reviewed by a federal district court under § 7702.

It is undisputed that cases arising only under the CSRA proceed to the MSPB and a record

is created  to permit further review in either the Federal Circuit or a federal district court.  *See* 5

U.S.C. § 7702; *see also Hooven-Lewis,* 249 F.3d at 275-78.  Yet, under the reasoning of *Ikossi, Seay,*

and *Doyal*, a different procedure would apply to cases initiated at the agency through the EEO process that had not been decided in 120 days; those cases suggest that nondiscrimination claims (e.g. WPA, CSRA) should be permitted to proceed to a federal district court *absent* the MSPB record. However, this approach undermines the efficacy and desirability of record review of CSRA decisions, and it appears inconsistent to permit some claims to come to the court based upon a review of the record while others would receive *de novo* review.

Federal courts have conducted record review of CSRA decisions. *See Hooven-Lewis*, 249 F.3d at 275-78 (reviewing employment discrimination issues *de novo* but conducting MSPB record review of MSPB decisions); *accord Vickers v. FDIC*, 493 F.3d 186 (D.C. Cir. 2007) (reviewing employment discrimination issues *de novo* but conducting MSPB record review of MSPB matters); *Daughety v. Thompson*, 322 F.3d 1249 (10th Cir. 2003) (reviewing Title VII issues *de novo* but conducting record review of MSPB decisions); *Kelliher v. Veneman,* 313 F.3d 1270, 1273 (11th Cir. 2002) (applying *de novo* review to Title VII issues but record review to MSPB decisions). This policy of consistency is supported by the professed intent to encourage uniformity in judicial review of federal personnel claims. S. Rep. 95-969, 1978 U.S.C.C.A.N. 2723, 2784 (July 10, 1978). Moreover, an employee is permitted to bring both her discrimination and nondiscrimination claims to the MSPB for review, which permits the MSPB to create a record on the nondiscrimination claims for later judicial review. 5 U.S.C. §§ 7701, 7702.

Though Dr. Bonds did not bring her claims to the MSPB first, but rather to the NIH's EEO office, the same analysis should apply. The administrative regime permits an employee to obtain a decision from the MSPB on all of her nondiscrimination claims and then to receive record review in a federal district court without prejudice to her right to bring her discrimination claims to a federal

district court for *de novo* review on those issues only.  It would be incongruous to apply one standard (record review) to employees who brought their nondiscrimination claims before the MSPB but to apply a different standard (*de novo*) to employees who bring their nondiscrimination claims directly to a district court.

The CSRA was enacted to provide "an exclusive administrative and judicial remedy for federal employees challenging adverse employment actions." *Koch v. Bloch*, 2006 U.S. Dist. LEXIS 59480, at *13-*14 (D.D.C. 2006); *see also Hall v. Clinton*, 235 F.3d 202, 204 (4th Cir. 2000) ("The CSRA 'comprehensively overhauled the civil service system,' creating a 'framework for evaluating adverse personnel actions against [federal employees].'").  "A primary purpose of enacting the CSRA was to 'to replace the haphazard arrangements for administrative and judicial review of personnel action' that existed prior to the CSRA." *Hall*, 235 F.3d at 204-05.  The CSRA "prescribes in great detail the protections and remedies applicable to [adverse personnel actions against federal employees], including the availability of administrative and judicial review." *Id.* at 204.

Accordingly, a federal employee may bring her entire case, including nondiscrimination and discrimination issues, to the MSPB and obtain an order or decision from the MSPB on all issues. The MSPB decision on the discrimination issues will be then be subject to *de novo* review in a district court, while the decision on nondiscrimination issues will be subject to record review. Simply put, consistency is served by adhering to the scheme set forth by Congress that contemplates record review of issues appealable to the MSPB (i.e. WPA and CSRA) and *de novo* review of discrimination issues.

The Court finds that there is substantial doubt regarding whether the Court has jurisdiction over the claims asserted in Count V absent a completed record from the MSPB that would permit

the Court to engage in record review.  Because the Fourth Circuit has not yet had the opportunity to reach and resolve this jurisdictional issue, the Court concludes that even if *arguendo* jurisdiction were properly vested and thus could be exercised by this Court, Dr. Bonds has nevertheless failed to exhaust her administrative remedies (as explained below) and accordingly, her claims under the CSRA in Count V must be dismissed.

### 2.    Exhaustion

Assuming, without deciding, that the Court has jurisdiction to consider the CSRA claim of Dr. Bonds, the Court finds that, upon reconsideration,[14] she has failed to exhaust her administrative remedies with regard to this count of her complaint.

Prior to filing a Title VII claim, a claimant must pursue and exhaust administrative remedies with the EEOC or its state equivalent because courts may exercise jurisdiction over only those claims encompassed within the EEOC charge and claims "like or related to allegations contained in the charge, or which grow out of such allegations."  *Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992) (citations omitted).  "Allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge circumvents the EEOC's investigatory and conciliatory role." *Riley v. Tech. & Mgmt. Servs. Corp., Inc.,* 872 F. Supp. 1454, 1459(D. Md. 1995) (Williams, J.) (holding that plaintiff had not exhausted her administrative remedies because there was "no mention of a hostile work environment or sexual harassment of any kind in their EEOC charges (or in their Complaint)[, i]nstead, each EEOC charge merely alleges that [the employer] discriminated against hem because they are women.").

---

[14]After a hearing on August 18, 2008, The Court dismissed the CSRA claim of Dr. Bonds on the basis that she had not exhausted her administrative remedies under the CSRA with regard to her termination. *See* [Paper No. 29].

Factual allegations made in formal litigation must correspond to those set forth in the administrative charge. *Chacko*, 429 F.3d at 509.  A plaintiff's claim generally will be barred if her charge alleges discrimination on one basis – such as race – and she introduces another basis in formal litigation – such as gender. *See Bryant v. Bell Atl. Md., Inc.,* 288 F.3d 124, 132-33 (4th Cir. 2002); *see also Sloop v. Mem'l Mission Hosp., Inc.*, 198 F.3d 147, 149 (4th Cir. 1999) (holding that Title VII retaliation claim was barred for failure to exhaust when administrative charges alleged only age discrimination).  A claim will also typically be barred if the administrative charge alleges one type of discrimination – such as discriminatory failure to promote – and the claim encompasses another type – such as discrimination in pay and benefits. *See Evans v. Techs. Applications & Serv. Co.,* 80 F.3d 954, 963-64 (4th Cir. 1996); *Lawson v. Burlington Indus., Inc.,* 683 F.2d 862, 863-64 (4th Cir. 1982) (holding that claim of discriminatory failure to rehire was barred for failure to exhaust because the administrative charge alleged illegal layoff only).

Similarly, the Fourth Circuit has held that the allegation of a discrete act or acts in an administrative charge is insufficient when the plaintiff subsequently alleges a broader pattern of misconduct. *See Dennis v. County of Fairfax*, 55 F.3d 151, 156-57 (4th Cir. 1995) (holding that allegation of discrimination in discipline in administrative charge did not encompass later claim in litigation that there was a broader pattern of discrimination in hiring, training, and promotion).  So too, if the factual foundation in the administrative charge is too vague to support a claim that is later presented in subsequent litigation, that claim will also be procedurally barred. *See Taylor v. Va. Union Univ.,* 193 F.3d 219, 239 (4th Cir. 1999) (en banc) (holding that plaintiff had not exhausted administrative remedies when the factual allegations of after-hours phone calls and touching were too inconclusive to suggest sexual harassment).

In a purely Title VII context, the Fourth Circuit has held that "[o]nly those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit." *Evans v. Techs. Applications & Serv. Co.,* 80 F.3d 954, 963 (4th Cir. 1996)). As such, "a plaintiff fails to exhaust [her] administrative remedies where . . . [her] administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in [her] formal suit." *Chacko v. Patuxent Institution,* 429 F.3d 505, 506 (4th Cir. 2005). Because lawyers do not typically complete the administrative charges, courts tend to construe them liberally. *Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll.,* 848 F.2d 457, 460 (4th Cir. 1988). However, "the allegation of a discrete act or acts in an administrative charge is insufficient when the plaintiff subsequently alleges a broader pattern of misconduct." *Id.* (citations omitted).

On the other hand, the Fourth Circuit has held that if the factual allegations in the administrative charge are reasonably related to the factual allegations in the formal litigation, the connection between the charge and the claim is sufficient. *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247-48 (4th Cir. 2000); *accord Freeman v. Oakland Unified Sch. Dist.,* 291 F.3d 632, 636 (9th Cir. 2002) ("The crucial element of a charge of discrimination is the factual statement contained therein.") (internal quotation marks omitted); *Kersting v. Wal-Mart Stores, Inc.,* 250 F.3d 1109, 1118 (7th Cir. 2001) ("[T]he EEOC charge and the complaint must, at a minimum, describe the same conduct and implicate the same individuals.") (internal quotation marks omitted).

Here, Dr. Bonds initiated a complaint with the agency's EEO office on February 16, 2007, concerning her removal from federal service.  Pl.'s Mot. Reconsideration Ex. 1 (2/16/07 Amendment).  In it, Dr. Bonds alleged *inter alia* that she

was fired on October 24, 2006 in retaliation for having filed 3 prior EEO Complaints and a Whistleblower Complaint with the Office of Special Counsel. On October 11, 2005, I was removed as the project officer for the SWiTCH Trial, and November 15, 2005, I was removed as the project officer for the BABY HUG Trial after I ordered the destruction of genetic material that had been obtained by Dr. Russell Ware of St. Jude Children's Hospital without informed consent. My order to have the genetic material destroyed was overruled by Dr. Peterson, and when I protested to Dr. Elizabeth Nabel, Director of NHLBI, I was removed as the project officer for the BABY HUG Trial. I then filed a Whistleblower Complaint with the Office of Special Counsel, and this complaint was accepted for investigation on March 17, 2006. When my EEO Counselor, Michael Chew, notified Dr. Peterson that I had the right to speak to my attorney, Dr. Peterson read all of my email [sic] to my attorney and placed me on administrative leave. I was notified that I would be fired on October 24, 2006 after I was accused of doing something that I did not do by the BABY HUG Drug Distribution Center at Perry Point, Md. This accusation was made in retaliation for my prior EEO activity and my Whistleblower Complaint as well as to avoid accepting responsibility by the Perry Point staff for having removed the expiration date from the BABY HUG Study Treatment labels without written authorization from me. Blaming me for this misconduct prevents the true culprits at Perry Point to escape responsibility and sanctions from the Food and Drug Administration and made it possible for Dr. Peterson to have the excuse to fire me which he has been attempting to do because of my prior EEO complaints against him.

In addition, Dr. Peterson did not provide me with adequate support staff help to assist me with filing which I needed because of my physical limitations. I have a partially paralyzed right leg and my knee joint in that leg was replaced in 2004. Because of these physical limitation, I was unable to stand for any length of time to file any paperwork in my office.

Pl.'s Mot. Reconsideration Ex. 1 at 1-2.

The complaint of Dr. Bonds was accepted as a "mixed-case complaint of discrimination" on March 21, 2007. Pl.'s Mot. Reconsideration Ex. 2 at 1. The EEO division of the NIH explained that "A 'mixed-case complaint' is a complaint of employment discrimination filed with a federal agency based on race, color, religion, sex, national origin, age, disability or reprisal related to or stemming from an action that may be appealed to the Merit Systems Protection Board (MSPB)." *Id.* It further explained that "[i]n that [her] allegation (removal from Federal Service) stems from an action that

may be appealed to the MSPB this complaint will be treated as a mixed-case." *Id.* The letter of acceptance explained that "[t]he following alleged claim has been accepted for investigation: Whether [Dr. Bonds] was discriminated against on the bases of race (African American), sex (Female), age (DOB: 09/23/1947), physical disability (Partially Paralyzed Right Leg) and reprisal/retaliation (prior EEO activity) when on October 24, 2006, she was removed from the Federal Service." *Id.*

As a threshold matter, her claim that the letter of acceptance's notation that her case was being accepted as a "mixed-case complaint" is dispositive of the fact that the EEOC was aware of the fact that Dr. Bonds was raising CSRA claims is misguided and inaccurate. As Dr. Bonds acknowledges, a "mixed-case complaint" is one that raises employment discrimination claims "related to or stemming from an action that can be appealed to the Merit Systems Protection Board." *See* 29 C.F.R. § 1614.302(a)(1). An "appealable action" includes, *inter alia,* removal from federal service. 5 U.S.C. § 7512. While CSRA claims are directly appealable to the MSPB, so too are Whistleblower Protection Act claims, like the ones Dr. Bonds raised in her EEO complaint. 5 U.S.C. § 1214(a)(3). Thus, despite her contention that the acceptance of her complaint as a "mixed-case complaint" implicitly demonstrates that the EEO was aware of and thus investigating her CSRA claims, the facts in the record (specifically, her EEO complaint and the EEO letter of acceptance) unequivocally demonstrate that the only claims articulated by Dr. Bonds in her EEO complaint were her claims under Title VII and the WPA. It is undisputed that there is no mention in her complaint to the MSPB of the CSRA *or* any allegation that the discipline she received was disproportionate. *See* Pl.'s Mot. Reconsideration Ex. 1 at 1-2. The basis for the EEO's determination that Dr. Bonds presented a "mixed-case complaint" most likely stemmed from her explicit allegations of a WPA

violation, which is directly appealable to the MSPB, rather than the EEO's divining from the tea leaves of her Title VII and WPA claims that she also intended to "implicitly" assert a CSRA claim.

The Fourth Circuit's reasoning and conclusion in *Chacko* are applicable here. There, the plaintiff alleged in his administrative charge that there were three specific acts of harassment by his supervisor but, in subsequent litigation, the plaintiff asserted claims that his co-workers engaged in long-term national-origin-based harassment that focused primarily on the use of epithets. *Chacko*, 429 F.3d at 509. In holding that plaintiff had not exhausted his administrative remedies, the Fourth Circuit reasoned that "a reasonable investigation of discrete instances of supervisor misconduct not involving name calling could not have been expected to lead to a continuous pattern of nonsupervisory misconduct which did involve name calling." *Chacko*, 429 F.3d at 512 (noting that "the administrative charges and the evidence at trial describe two different cases, and that is precisely the sort of disjunction that the administrative complaint process is designed to avoid."). The Fourth Circuit held that "[t]he proper comparison is whether the main evidence advanced at trial – coworker name calling – is reasonably related to the allegations in the administrative charges – three specific confrontations with supervisors not involving national-origin slurs." *Id.* Similarly here, the administrative charges by Dr. Bonds in her EEO complaints alleged entirely different statutory causes of action (claims that she was discriminated and retaliated against on the basis of age, race, sex, and physical disability in violation of Title VII and the WPA) than the causes of actions asserted in her complaint in federal district court (which appended a claim under the CSRA, alleging that Dr. Bonds did not engage in the misconduct alleged as a basis for her termination and that the penalty imposed was too harsh even if she had engaged in some or all of the actions for which she was charged). Compl. ¶¶ 97-102. In light of the Fourth Circuit's reluctance to hold that

72

the *Chacko* plaintiff had exhausted her remedies when she alleged different *types* of harassment under Title VII, the Court finds that there is an even more attenuated relationship between the administrative charges by Dr. Bonds of discrimination and retaliation under Title VII and the WPA as compared to her allegations of unwarranted disproportionate discipline under the CSRA. However liberally the Court construes the charges, it finds that the allegations of discrimination and retaliation under Title VII and the WPA are not reasonably related to the allegations of unwarranted disproportionate discipline under the CSRA.  To hold otherwise would be to effectively read *all* discrimination and retaliation claims that involve *any* form of administrative suspension or removal as claims under the CSRA; the Court "decline[s] to interpret the exhaustion requirement so narrowly as to render it a nullity and undermine the purposes of fair notification, conciliation, and preservation of resources that Congress intended for it."  *Chacko*, 429 F.3d at 512-13.

A comparison of the administrative charges by Dr. Bonds and her subsequent complaint before this Court demonstrate that she is attempting to bring issues before this Court that she did not raise at the administrative level.  The complaint in this Court explicitly alleges that her removal from federal service was "overly harsh and violated the CSRA," that the NHLBI engaged in conduct designed to "provok[e] [a] response from plaintiff," and that the NHLBI misapplied the *Douglas* factors.  Compl. ¶¶ 98, 100-01.  None of these allegations appears in her February 16, 2007 EEO complaint, which is devoid of any reference to the CSRA, the *Douglas* factors or their alleged misapplication.  The only nondiscrimination issue that the February 16, 2007 EEO complaint raised was the Whistleblower Protection Act claim.

In response, Dr. Bonds contends that her "Title VII claim concerns events leading up to her termination and the termination itself, and her CSRA claim concerns the exact same termination,

i.e., the conduct, time frame, and actors [are] identical." Pl.'s Reply Mot. Reconsideration at 2. Dr. Bonds contends that "upon filing a valid mixed case complaint the agency's EEO office was required to investigate not only her discrimination claim, but also to ensure that the agency did not violate the CSRA" and that "[a]ny reasonable investigation of [her] CSRA claim necessarily had to involve an evaluation of the "*Douglas* factors" particularly because they are discussed in the memorandum terminating [Dr.] Bonds." *Id.* Dr. Bonds also asserts that she "specifically raised during the course of the EEO Office investigation the unjustified nature of her termination based on the mitigation factors identified in *Douglas*." *Id.* at 2-3.

In support of this contention, Dr. Bonds cites to her affidavit that formed part of the EEO Administrative Record. *See* Pl.'s Ex. 148 at 11, 15-16. In that affidavit, Dr. Bonds states *inter alia* that "I can think of no good performance or conduct related reasons that would warrant the drastic step of removing me from all involvement with the trial . . . . I believe that a fair reading of the record in this case, with consideration given my professional achievements at NIH and as a medical doctor, and to my solid performance record and dedication to my work with sickle cell disease, will show that, more likely than not, the reasons that have been give by my supervisors for their actions against me do not justify ruining my career at the agency . . . . None of the[] charges are [sic] meritorious or worthy of the extreme step of terminating me from my position I have held with honor . . . for almost 16 years." *Id.*

The cases that Dr. Bonds cites do not support a finding that her CSRA claims have been exhausted. She primarily relies on *Lang v. MSPB*, 219 F.3d 1345 (Fed. Cir. 2000) as support for her contention that she had exhausted her CSRA claim even though her administrative charge neither mentioned the CSRA, the *Douglas* factors, or their alleged misapplication. *Lang* does not stand for

the proposition that a complainant may allege one claim at the administrative level (such as a WPA or Title VII) and then allege that that claim also subsumes a CSRA claim; rather *Lang* resolved only whether the MSRB erred in declining to apply rules for the timing of mixed-case appeals to Mr. Lang's complaint. *Id.* at 1347.

Significantly, exhaustion of administrative remedies is also required before the proceeding before the MSPB. *See Bosley v. MSPB*, 162 F.3d 665 (Fed. Cir. 1998) (holding that "if the party fails to raise an issue in the administrative proceeding or raises an issue for the first time in a petition for review by the full Board, this court will not consider the issue.") (citations omitted).

It does not appear that Dr. Bonds has adequately exhausted her CSRA claim because it does not appear anywhere in her February 2007 EEO Complaint.   Her EEO Complaint contains allegations that Defendants retaliated against her by terminating her, but does not contain any allegation that Defendants' conduct violated the CSRA, such as by imposing an excessively harsh discipline for her behavior.   Her EEO Complaint is devoid of any suggestion that Defendants

violated the CSRA for imposing a disproportionate discipline in violation of the CSRA's *Douglas*[15] factors.   Though Dr. Bonds contends that she has exhausted her CSRA remedy in that her EEO Complaint is related to the same time frame, actors, and conduct as her CSRA claim, it does not appear that the issues of retaliation raised in her EEO complaint necessarily put the EEOC on notice that her discipline was unnecessarily harsh in light of the *Douglas* factors.   Dr. Bonds has not administratively exhausted her claim because a finding of discrimination or retaliation under Title VII (i.e. that Dr. Bonds should not have been disciplined at all, much less removed as PO or terminated) is not necessarily co-extensive with a finding that the CSRA was violated (i.e. that Dr. Bonds should have been disciplined but to a lesser degree).   Accordingly, Dr. Bonds has failed to exhaust her administrative remedies and thus her CSRA claim is not properly before the Court.

### IV.  CONCLUSION

For the foregoing reasons, summary judgment will be entered in favor of all Defendants.  A separate Order follows.

Date: August 13, 2009                            _____/s/_____
                                                                 Roger W. Titus
                                                                 United States District Judge

---

[15]The *Douglas* factors are criteria that federal managers are to take into consideration when deciding what a reasonable penalty is for an employee's misconduct.  *Douglas v. Veterans Administration*, 5 M.S.PR. 280 (1981).